# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

**October 14, 1998**

**Cecil W. Crowson**
**Appellate Court Clerk**

BAXTER NEAL HELSON,       )
                          )
    Plaintiff/Appellant,  )
                          )    Appeal No.
                          )    01-A-01-9802-CH-00091
VS.                       )
                          )    Williamson Chancery
                          )    No. 24911
LETICIA FINLEY CYRUS,     )
                          )
    Defendant/Appellee.   )


APPEALED FROM THE CHANCERY COURT OF WILLIAMSON COUNTY
AT FRANKLIN, TENNESSEE

THE HONORABLE HENRY DENMARK BELL, CHANCELLOR


CHARLES G. BLACKARD, III
155 Franklin Road, Suite 155
Brentwood, Tennessee 37027
    Attorney for Plaintiff/Appellant

J. RUSSELL HELDMAN
320 Main Street, Suite 101
Franklin, Tennessee 37064
    Attorney for Defendant/Appellee


AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED


BEN H. CANTRELL, JUDGE


CONCUR:
TODD, P.J., M.S.
CAIN, J.


# O P I N I O N

The issues in this appeal involve the lower court's order incorporating (1) a provision that a nine-year-old child did not have to visit with his father against his (the child's) wishes and (2) a provision that the mother was to arrange a private phone call between the child and his father once a week. We reverse the order with respect to visitation. Otherwise we affirm.

## I.

The Circuit Court of Boyd County, Kentucky entered an agreed order on May 22, 1992 granting primary custody of a minor child to the mother, and setting specific times for the father's visitation. Subsequent orders made some minor alterations, primarily with respect to visitation during summer vacations.

The mother moved to Williamson County and later remarried. The father also moved to the Nashville area. On August 28, 1997 the father filed a petition in the Williamson County Chancery Court to enforce the Kentucky orders and to set specific times for visitation. The mother filed a motion for an order that there be no forced visitation between the father and child, and that the father be enjoined from making derogatory statements about the mother, or the mother's family, in the presence of the child.

After a hearing, the chancellor entered an order adopting and domesticating the orders from Boyd County, Kentucky. The order resulted in what the lower court termed, "standard every other weekend visitation and such visitation is not to be supervised."

On the mother's motion that the child not be forced to visit with his father, the court ordered the following:

> 6. Defendant's motion for an order of no forced or coerced visitation is granted. Plaintiff's visitation or visitation privileges with the minor child shall not be coerced or forced

- 2 -

by anyone against the minor child's wishes, and the minor child shall not be required, to visit with Plaintiff against the minor child's wishes.

7. Defendant shall tell the minor child that he is not to be forced to go on visitation with Plaintiff, that if he does not want to go on visitation, he does not go, and that he does not have to go on visitation unless he decides he wants to go.

8. Defendant shall arrange for the minor child to make a weekly telephone call to Plaintiff in a location where no one is hearing what the conversation is on the calling side, said weekly telephone call to occur approximately at 7:00 p.m. each Sunday evening.

\* \* \*

11. Defendant's motion for an order requiring visitation to be supervised is denied at this time; and Defendant's motion for an injunction against Plaintiff from making derogatory statements is hereby granted and is made reciprocal against both parties and therefore Plaintiff and Defendant each are hereby enjoined and restrained from making derogatory statements about the other or members of the other's family, including grandparents, in the presence of the minor child.

## II.

The lower court's order was based on the testimony of the child's mother, his grandmother, and a treating psychiatrist. All of the witnesses testified that the child did not wish to ever visit his father again or even to talk to him on the telephone. The animosity, according to the witnesses, grew out of the father's acts in (1) cutting the child's hair when he visited with the father and (2) persisting in calling the child Neal when he preferred being called "Trace."

Although the mother has custody, the child actually lives with his grandmother and a ten-year-old half sister, in a house close to where the mother and stepfather live with their two smaller children. The mother and grandmother testified that when the child went off with the father he did so reluctantly, and when he came home he would be upset and agitated. He begged not to be made to go with his father or to talk to him on the telephone. From the time he was three, he had often

- 3 -

begged to be able to talk to someone, a judge or the police, so that he would not have to visit his father. He hated the haircuts given him by his father and he wished to be called Trace.

The psychiatrist who had been treating the child since 1994 testified that the child had an attention deficit and anxiety disorder and was hyperactive. The attention deficit disorder was being treated with the drug Ritalin. The anxiety disorder concerned a fear of being separated from his grandmother. He also had a long standing fear of getting his hair cut. The psychiatrist had written a letter to the mother's lawyer stating the child's fears in this regard. The psychiatrist testified, however, that the child had never voiced a determination not to visit with his father again until he returned from the summer visitation in August of 1997. When asked if she had an opinion on whether the child should be forced to visit with his father, the psychiatrist said, "I think to force it when a child is this opposed would be really anxiety-provoking and very difficult for him. So I don't think it should be forced."

The father's testimony gave an entirely different picture. He testified that the haircuts he had given the child were with the child's consent and that the only objection to the use of the name "Neal" came from the child's grandmother.

The chancellor made only a few findings of fact. At the end of the hearing he discussed the proof with the lawyers:

> [THE COURT]: At the same time, I think we've got a child who is in a predicament where to force him probably would make the relationship, the possibility of a relationship worse rather than better, and that's the sense I get from what the psychiatrist testified to. And I think there was something in there about -- I don't remember anything about him drinking or anything that would suggest fear.
>
> * * *
>
> Well, the psychiatrist was watching the child and trying to give a full report, I think. And it boils down to the fact that what was truly significant to the child was a damn haircut.

- 4 -

* * *

But the way it is, that's apparently a big thing to the child and I don't know anything to do about that except I think his credibility -- he got the haircuts, as the child says and the maternal side has testified, I think, he got the haircuts. And I think that was so out of proportion to the significance that it should have, but as the psychiatrist says, whatever you think or I think, to him it's of vital importance.

And as I'm getting the sense of it, that and the name "Trace" have been a bee in the child's bonnet that have kept him from having as good a relationship as he should.

* * *

I wouldn't make a finding, as I said, I have a profound suspicion and have had those profound suspicions before, and all I can say is that I believe that if the grandmother has intentionally tried to destroy or harm the possibilities of a good relationship, I firmly believe there is an especially hot place in hell waiting for her. That's all. I'm just a Judge. And I don't think -- and on that I think my judgment is just as good as the psychiatrist. And to have this child come in and say that, whether he is programmed or not, it's a fact of life that he would say that he doesn't want to be forced.

So, the visitation will, I guess, need to be amended only -- I think it certainly can't be increased. I think the visitation schedule should be as it is, at this home, wherever it may be, and I don't think it needs to be supervised. On the other hand, the motion that it not be forced, I think that has to be sustained.

MR. HELDMAN: Thank you, Your Honor.

THE COURT: There's no way I can fix it, except that I think there needs to be something that puts the burden, that there be some required contact. Visitation, can't make him go. If he says he doesn't want to go, he doesn't go. I think the child should be told that, that he is not to be forced, and that he doesn't have to go until he wants to. And he's going to have to decide whether he wants a relationship or not.

But I think there ought to be an order -- I don't know what -- this lady is not a party to this proceeding. I can't order her to do anything, except she's there. But I can order this lady because she is the mother of the child, and so the order will be on her to make arrangements for the child to make weekly telephone calls to the father with no one hearing what the conversation is on the calling side.

The chancellor did not find that visitation with the father would be detrimental to the child or that it was in the child's best interests to have the father's visitation

- 5 -

terminated. In fact, the visitation orders are still in effect. So, the father's visitation with the child will be determined solely by the child's wishes.

## III.

In this case, one of an increasing number involving coercive visitation orders, we start by recognizing a general rule: that 'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427 at 429 (Tenn. 1988). *See also Edwards v. Edwards*, 501 S.W.2d 283 (Tenn. App. 1973). We have no problem with the trial judge terminating visitation privileges altogether on a finding that such visits would result in harm to the child "in either a physical or moral sense." *See Suttles* at 429. We are also told that visitation can be denied to a non-custodial parent when it would result in severe emotional harm. *See* Tenn. Code Ann. § 36-6-301 (Acts 1995, ch. 428, § 3). But absent such findings, the public policy of this state is that the court <u>shall</u> "grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship." *Id. See Pizzillo v. Pizzillo*, 884 S.W.2d 749 (Tenn. App. 1994).

The chancellor recognized these principles when he entered the visitation orders from the Kentucky court. As the record now stands the father has the right to have the child with him a certain number of days each month, for a time in the summer, and on certain holidays. The number and length of the visitation periods on the face of the order are not an issue on appeal. The chancellor did not find that the exercise of the court-ordered visitation would harm the child in any way, physically, morally, or emotionally -- even though the psychiatrist offered some limited testimony concerning the child's emotional state. We do not think that the psychiatrist's opinion that forced visitation would provoke anxiety in the child and would be "very difficult for him" rises to the level of the severe emotional harm described in the statute.

- 6 -

We come back to the conclusion that the visitation in this case is based entirely on the child's wishes, and we conclude that allowing a nine-year-old boy to decide whether his father can exercise his court-ordered visitation is not an exercise of the chancellor's discretion. Rather, it leaves the question to the discretion of the child. As we have recently held, the child's preference is only one factor to be considered in deciding which parent gets custody of the child. *See* Tenn. Code Ann. § 36-6-106. "It simply can't be the only factor to consider in deciding visitation privileges." *Wilson v. Wilson*, No. 01-A-01-9707-CV-00325 (Nashville, Sept. 2, 1998), slip op. *18.

We are aware of at least two opinions of this court with which our holding in this case seems to conflict. And we fear that those cases are being interpreted as a mandate to the trial courts to refrain from ordering a child to visit with the non-custodial parent against the child's wishes. We think that is an erroneous interpretation of both cases.

Perhaps the leading case is *Jones v. Jones*, No. 01-A-01-9607-CV-00346 (Nashville, Feb. 26, 1997) in which the trial judge had ordered "meaningful visitation" with the non-custodial parents (the mother had custody of the two younger children; the father custody of the two older ones). The court went further to order that if a child refused to comply with the court's orders, an unruly child petition would be filed against the child in the juvenile court. On appeal this court said:

> Custody and visitation issues touch the homes, hearths, and hearts of emotionally vulnerable children and adults. The sensitive circumstances of a family broken apart by divorce require restraint and understanding rather than heavy handed, authoritarian intervention. Thus, custody and visitation orders should reflect the realities of all family members and should promote conduct that is reasonable in light of all the circumstances. They should be detailed enough to enable the parties to understand precisely what the court expects of them and what the consequences of their failure to abide by the court's order will be.

Meaningfulness is a vague and subjective concept. Visitation that might be considered meaningful by some might not be considered meaningful by others. No consistently reliable basis exists for determining whether a particular visit was meaningful or not. Accordingly, meaningfulness does not provide a workable standard for visitation arrangements because it fails to inform the parties of the precise conduct expected of them.

There are also practical limits on a court's ability to restore the bonds of trust and affection in dysfunctional families. Most courts do not have the resources or expertise for this type of sustained intervention. Coerced visitation is rarely meaningful and usually drives family members farther apart. Accordingly, courts should avoid attempting to force meaningful relationships upon parents and children who have been alienated from each.

The trial court went too far when it ordered the children to have "meaningful visitation" and when it required the parents to coerce the children to comply with the visitation schedule. Accordingly, we modify the trial court's visitation and custody decrees by deleting both the requirement that visitation be "meaningful" and the parents' obligation to commence unruly child proceedings if the children do not cooperate with visitation. Since the parties' oldest child has now reached the age of majority, the parties' only remaining obligations are to refrain from disparaging each other in the presence of their children and to cooperate with their respective efforts to have visitation in the manner prescribed by the trial court. The parents should not be required to force their children to engage in visitation against their wishes.

The general impression that trial judges can't order children to visit their non-custodial parents is probably based on the last sentence of the quoted paragraphs. But the opinion should be read in context. The children involved in *Jones* were at or near the age of majority, and they had lived in the same household with their mother until two years earlier. There was, consequently, no suspicion that the custodial parent had deliberately alienated the children from their mother. Under such circumstances this court was reluctant to venture out on a course that might make things worse.

In this case, the child has lived virtually all his life apart from his father. He is now nine. Although it is clear that he has expressed a wish not to visit his

father, we cannot accept the conclusion that the court has no power to render aid to the father in furtherance of the statutory mandate to promote the parent-child relationship.

In addition, after we reversed the more radical provisions in *Jones*, the parties still had an obligation "to cooperate with their respective efforts to have visitation in the manner prescribed by the trial courts." Slip op. 5. In this case the chancellor allowed the mother to tell the child that he did not have to go with his father against his wishes. We think this is a guarantee that the child will never visit with the father as long as the child is under the custody and control of the mother and grandmother.

Another case involving forced visitation is *Collins v. Collins*, No. 01-A-01-9211-CV-00459 (Nashville, May 26, 1993), where this court affirmed the trial court's refusal to force a fourteen-year-old daughter to visit with her mother. The child's objections were based on her strong religious feelings that her mother's homosexual lifestyle was improper.

The trial court in that case, however, found that forced visitation would be detrimental to the child/parent relationship. The court also found that the relationship should be encouraged by unmonitored telephone privileges and an admonition to the father not to take any action that would alienate the child from the mother. We do not think *Collins v. Collins* is authority for the action taken by the trial judge in this case.

## IV.

We reverse the portion of the chancellor's order holding that the child does not have to visit with his father and that the mother should instruct the child that

he does not have to visit his father if he doesn't wish it. Without a finding that the visits would harm the child, such an order is contrary to the public policy of this state as expressed in our Code and the cases interpreting it.

We should add, however, that enforcing the visitation orders is another problem. As we said in *Jones*, we think that threatening the parents with contempt or the child with delinquency proceedings is rarely effective and frequently counter-productive. As long as the custodial parent is neutral toward the visitation and refrains from taking any action to alienate the child from the other parent, the burden is on the non-custodial parent to establish the mutual trust and confidence that must be the basis for a meaningful relationship. We cannot believe that a loving parent would insist on making his child miserable.

The child's separation anxiety in this case may be triggered by the length of the visitation periods. When the parties were living so far apart, a visit of some days and nights was probably the only practical solution. But with the parties living within a short drive of each other, a more creative plan involving short-term visits at the beginning might mitigate the anxiety. If the child knew that he would return to his home at night and that his father wouldn't cut his hair, his feeling of security would surely improve. On remand the trial court is free to examine all possibilities.

We would make one more observation about the child's hair. The style and length of the hair of a child of this age is ordinarily a choice for the custodial parent. The father should respect the joint decision of the mother and the child.

With respect to the child's name, we are of the opinion that the father may use the child's given name when referring to him. The father's wishes should command the same respect that any parent is due on such a personal choice. To give the child a veto power on this issue sets a bad example for the child. We would

also add that the father should respect the child's wishes with respect to the name he wishes to be called in his other personal relationships. Therefore, the father should not threaten to contact the child's school or other third parties to insist that they use the child's given name.

## V.

The mother has appealed the lower court's order on the telephone conversations between the father and child. As indicated in the foregoing portions of this opinion we find the mother's position on this issue to be without merit.

The lower court's order is reversed as indicated in this opinion. In all other respects it is affirmed. The cause is remanded to the Chancery Court of Williamson County for further proceedings. Tax the costs on appeal equally to the parties.

_____
BEN H. CANTRELL, JUDGE

CONCUR:

_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION

_____
WILLIAM B. CAIN, JUDGE