IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 7, 2000 Session

## ANTHONY GALE WIX v. CATHY MARIE WIX

**Appeal from the Chancery Court for Lewis County**
**No. 3862     Russ Heldman, Judge**

---

**No. M2000-00230-COA-R3-CV - Filed March 7, 2001**

---

This appeal involves the dissolution of an eighteen-year marriage by the Chancery Court for Lewis County. The trial court awarded the wife the divorce after concluding that the husband's continuing extramarital affair amounted to inappropriate marital conduct. To protect the "moral integrity of the marital relationship," the trial court granted the wife sole custody of the parties' two minor children and declined to grant the husband any visitation rights. In addition, the trial court ordered the husband to pay more than the minimum child support required by the child support guidelines because he was willfully underemployed and because he would not be exercising standard visitation with the children. The husband asserts on this appeal that the trial court's decisions with regard to custody and visitation, child support, and the division of the marital estate lack evidentiary support. We have determined that the trial court's disapproval of the husband's extramarital affair inappropriately colored its decisions regarding visitation and child support. Accordingly, we affirm the manner in which the trial court divided the parties' marital estate and reverse the trial court's visitation and child support awards.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Christopher L. Dunn, Columbia, Tennessee, for the appellant, Anthony Gale Wix.

Michael E. Spitzer, Hohenwald, Tennessee, for the appellee, Cathy Marie Wix.

### OPINION

Cathy Marie Wix and Anthony Gale Wix were married in June 1980 in Georgia. Ms. Wix was sixteen-years old and had completed the tenth grade. Mr. Wix was a twenty-eight-year-old high school graduate who worked as a self-employed lumberman. Mr. Wix was also a widower, and this

marriage was his second. The parties had three children. The oldest was born in April 1981; the middle child in August 1987; and the youngest in November 1988.

Ms. Wix later earned her GED. Except for a four or five year period early in the marriage when she worked as a seamstress, Ms. Wix did not work outside the home because Mr. Wix desired her to remain at home to care for their children. Ms. Wix was diagnosed with breast cancer in 1995. Surgical intervention was ruled out because the cancer was too advanced. Accordingly, Ms. Wix received intensive chemotherapy from May 1995 through October 1995 followed by high-dose radiation treatments. These treatments caused Ms. Wix's cancer to go into remission; however, their effects rendered her essentially unable to work.

Mr. Wix's logging business began to founder in 1997. He incurred substantial debt in late 1997 or early 1998 when he purchased additional heavy equipment in the hope that he could reverse his failing financial fortunes. In August 1998, while on a business trip to Illinois, Mr. Wix began an extramarital affair with Elizabeth McClain, the wife of a fellow lumberman. When Mr. Wix returned home on August 30, 1998, he told Ms. Wix that he was in love with somebody else and that he wanted a divorce. The parties separated in September 1998, and on November 5, 1998, Mr. Wix filed a divorce complaint in the Chancery Court for Lewis County seeking a divorce on the grounds of irreconcilable differences and inappropriate marital conduct. He also requested joint custody of the parties' children. Ms. Wix counterclaimed for divorce on the ground of inappropriate marital conduct. She sought sole custody of the children but requested that Mr. Wix be granted "such visitation as the Court deems necessary in the best interest of the children." By March 1999 Ms. Wix had become romantically involved Calvin Sandy who later moved into the marital home with Ms. Wix and the children.

Ms. Wix moved for pendente lite support on September 20, 1999. At a hearing conducted one week later, the parties announced that they had agreed that Ms. Wix was entitled to the divorce on the ground of inappropriate marital conduct and that two tracts of jointly owned property should be sold. All other disputes were reserved for further hearing at a later time. On November 9, 1999, the trial court entered an order awarding Ms. Wix a divorce on the ground of inappropriate marital conduct.

The trial on the remaining issues began on November 10, 1999, before another trial judge.[1] The parties' lawyers made it clear from the outset that this hearing would focus primarily on disputes regarding the division of the marital estate and spousal support. They informed the trial court that their clients essentially agreed that Ms. Wix should have custody of the two minor children[2] and that Mr. Wix should have visitation. Mr. Wix's testimony regarding marital and business finances consumed the first day of the hearing. Before adjourning the hearing for the day, the trial court

---

[1]Judge Jeffrey S. Bivins presided over the September 27, 1999 hearing and issued the November 9, 1999 order granting Ms. Wix the divorce. Judge Russ Heldman presided over the remaining proceedings in the case.

[2]The parties' oldest child had become emancipated by the time of this hearing and was estranged from his mother for reasons that are not apparent in the record.

announced that it wanted to "give the parties and their lawyers some guidance." First, the court observed that "the non-custodial parent should have standard visitation and a liberal amount of time in the summer and alternate holidays, and that the children should have a good relationship with the visiting parent." However, the court also warned that "[t]he [c]ourt doesn't like live-in situations. It's [sic] never good for a child." Then, addressing Mr. Wix's cohabitation with Ms. McClain, the court commented:

> if Mr. Wix and Ms. McClain are inclined to get married, it would behoove them to do that, otherwise if there is a final hearing and I have to come down with a ruling, I might have to say some things and put some restrictions on people that they otherwise may [not] have if there is an agreement.[3]

Because the hearing would not resume for two weeks, the attorneys sought the trial court's guidance about their clients' live-in paramours. The trial court first observed:

> But I just don't understand what people - - what they think. Putting children in front of other men and women, and have them spend the night. No wonder this country is going down the tubes.

> *     *     *

> There is [sic] churches all around this courthouse, just flooding this town and this county. Isn't the message getting out what is good and bad, and what's right and wrong? I don't know. What do people have in their ears?

Thereafter, with regard to Ms. Wix, the trial court stated that "[u]ntil she marries somebody, she's permanently enjoined from having people live with her; men that are non-related." With regard to Mr. Wix, the court stated:

> When the children are with Mr. Wix, Ms. McClain needs to hit the road. If she wants to go see Mr. McClain and apologize for what she did to him, and try to seize some of that time to reconcile a terrible situation, that might be a good thing for her to do. I don't know what

---

[3]This is not the first instance where the trial court has implied that its custody and visitation decisions will be favorably influenced by a hastily arranged marriage. It has become customary for the trial judge to tell parties that their requests for custody and visitation will stand a better chance of success if they marry the person with whom they are living before the proceedings are concluded. *See, e.g., Fain v. Fain*, No. M1999-02261-COA-R3-CV, 2000 WL 1879548, at * 3 (Tenn. Ct. App. Dec. 29, 2000) (No Tenn. R. App. P. 11 application filed); *Murray v. Murray*, No. M1999-02081-COA-R3-CV, 2000 WL 827960, at *2 (Tenn. Ct. App. June 27, 2000) *perm. app. denied* (Tenn. Dec. 18, 2000); *Earls v. Earls*, No. M1999-00035-COA-R3-CV, 2000 WL 696816, *2 (Tenn. Ct. App. May 31, 2000) *perm. app. filed* (Tenn. Aug. 21, 2000).

she's going to do. But she's going to have to - - She's got to sleep elsewhere. And the children, hopefully their minds aren't seared with impropriety; that they'll be able to grow up and when they are tempted with these vices, they will choose the higher road.

And I just think that's the duty of the [c]ourt. Until the legislature or the Tennessee Supreme Court says otherwise, morals still have a place in the law. There wouldn't be any law if it weren't for morals. It came out of the Ten Commandments actually. That's where it all started. But things sort of went downhill after that.

Not surprisingly, Mr. Wix and Ms. McClain married before the trial resumed on November 24, 1999.[4] The testimony during this hearing focused on issues relating to the division of the marital estate and Ms. Wix's request for spousal support. Neither party presented the sort of evidence generally associated with custody and visitation disputes. Both parties apparently assumed that the custody and visitation issues were settled in light of the trial court's comments at the conclusion of the November 10, 1999 hearing indicating that Ms. Wix would receive custody of the children and that Mr. Wix would be given defined visitation rights. During her testimony, Ms. Wix agreed that the children loved Mr. Wix and that he loved them. She also agreed that the current visitation arrangements had been working and that awarding her custody and giving Mr. Wix visitation would work.

At the conclusion of the proof, the trial court awarded Ms. Wix sole custody of the minor children and refused to grant Mr. Wix visitation rights of any sort. The trial court also awarded Ms. Wix more child support than required by the child support guidelines because Mr. Wix had no visitation rights. After dividing the marital estate and apportioning the marital debts, the trial court ordered Mr. Wix to pay Ms. Wix $500 per month in spousal support and to pay her an additional $5,975 to defray her legal expenses. The trial court's statements from the bench reflect that each of these decisions was colored by the court's moral disapprobation of Mr. Wix's conduct. On this appeal, Mr. Wix takes issue with the trial court's refusal to grant him defined visitation rights, the calculation of his child support, and the manner in which the trial court divided the marital property.

# I.
## THE ERRONEOUS APPLICATION OF THE FALSUS IN UNO, FALSUS IN OMNIBUS MAXIM

As a preliminary matter, we take up the trial court's invocation of the maxim "false in one, false in all" to discount Mr. Wix's "testimony . . . as being unreliable and without credibility." While appellate courts routinely defer to a trial court's determinations regarding the credibility of witnesses appearing before them, *Long v. Tri-Con Indus., Ltd.*, 996 S.W.2d 173, 178 (Tenn. 1999); *Doe A v. Coffee County Bd. of Educ.*, 925 S.W.2d 534, 537 (Tenn. Ct. App. 1996), we may discount

---

[4]Ms. McClain took Mr. Wix's surname following the marriage, but for the sake of clarity, we will continue to refer to her as "Ms. McClain."

these determinations when the record contains clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999); *Thompson v. Crewell Indus. Supply, Inc.*, 936 S.W.2d 955, 957 (Tenn. Ct. App. 1996). We may also discount a trial court's credibility determination if it is based on an erroneous application of a recognized legal principle.

Prior to the trial of this case, Mr. Wix gave a deposition during which he undertook to place a value on many of the items of personal property included in the marital estate. His valuation testimony during the November 10, 1999 hearing differed from his deposition testimony in several particulars.[5] During cross-examination, he conceded that during the deposition, he "just ran numbers off the top of my head. I didn't know what the value of things are." During Mr. Wix's cross-examination, the trial court reminded his lawyer of "the titrant [sic] of evidence that says 'false in one, false in all'" and suggested that he begin thinking about how to rehabilitate his client on redirect. On redirect, Mr. Wix stated that there was no market for most of the items of personal property and that he and Ms. McClain had tried their best to figure how much each item of property was worth. He also stated that he was not intentionally trying to misrepresent the value of the property.

In its final ruling, the trial court cited Mr. Wix's testimony regarding the bedroom furniture and the horses[6] as the basis for its conclusion that Mr. Wix had not been a credible witness because he had given different values for the same items of personalty. Invoking the maxim, "false in one, false in all," the trial court stated that it would "not accord any credit to Mr. Wix's testimony concerning the values of property. And concerning what assets exist or do not exist. Therefore the court adopts Mrs. Wix' proposal concerning what the value of the assets are and what the assets are to be divided as the marital assets." Even though the trial court's oral ruling was limited to the credibility of Mr. Wix's valuation testimony, its decree recites that it "discounts the testimony of Anthony Gale Wix as being unreliable and without credibility."

The maxim "false in one, false in all" should not be used to discard a witness's testimony when the witness has simply made a mistake. The maxim becomes applicable only when the witness has deliberately and willfully given false testimony. *Curtis v. VanDusen*, 723 S.W.2d 648, 651 (Tenn. Ct. App. 1986); *Parsley v. Harlan*, 702 S.W.2d 166, 174 (Tenn. Ct. App. 1985); *McKinnon v. Michaud*, 37 Tenn. App. 148, 159, 260 S.W.2d 721, 725-26 (1953). In most circumstances, rather than discounting all of a witness's testimony because of irreconcilably inconsistent statements, the courts simply treat the two inconsistent statements as cancelling each other out. *In re Estate of Ross*,

---

[5]For example, Mr. Wix testified during his deposition that a horse trailer was worth $400, but at trial, he testified that it was worth only $50 because its floor had rotted out and because it had two flat tires. He also testified during his deposition that the parties' bedroom furniture was worth $3,500; while at trial, he testified that he could not recall that the parties had purchased this furniture for $2,600.

[6]While the record shows that the parties owned three horses, there is no indication in the record that Mr. Wix ever gave inconsistent testimony regarding their value. As best we can determine, the trial court meant to allude to Mr. Wix's testimony regarding the horse trailer rather than to the horses.

969 S.W.2d 398, 400 (Tenn. Ct. App. 1997); *Taylor v. Nashville Banner Publ'g Co.*, 573 S.W.2d 476, 482-83 (Tenn. Ct. App. 1978).

Based on the record in this case, the trial court had ample grounds to accredit Ms. Wix's valuation testimony over Mr. Wix's. In light of the inherently subjective nature of testimony regarding the value of items of personal property for which there is no ready market and Mr. Wix's candid admission that he was only giving his best estimate of the value of the property, the trial court's decision to discredit all of Mr. Wix's testimony went too far. Accordingly, for the purposes of this opinion, we concur with the trial court's decision to rely on Ms. Wix's estimated values of the parties' marital estate. However, we decline to exclude Mr. Wix's testimony regarding the other disputed issues on appeal, particularly the visitation and child support issues.

## II.
### THE DIVISION OF THE MARITAL ESTATE

Mr. Wix asserts that the trial court erred by refusing to equally divide the proceeds from the sale of a 396.95-acre tract of land. Rather than examining this portion of the trial court's decree in isolation, we must consider it in the context of its net effect on the entire property settlement. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998).

### A.

During their eighteen-year marriage, the parties accumulated marital property worth approximately $363,000. In addition to their marital home, the parties own four other tracts of real property worth approximately $174,200. The largest and most valuable piece of property was a 396.95-acre tract located in Lewis and Lawrence Counties. While the divorce proceedings were pending, the parties received an offer to purchase this tract for $150,000. The parties also amassed significant debt during their marriage. Their marital debt, including their mortgage, a car loan, and unpaid medical bills and property taxes, amounted to approximately $78,000. The debts relating to Mr. Wix's logging business amounted to approximately $123,800.

The trial court awarded Ms. Wix marital property valued at approximately $248,500, including the marital home, the 396.95-acre tract, a 1993 Jeep, a tractor, and approximately $12,000 in miscellaneous personalty. Mr. Wix received property worth approximately $114,500, including the three remaining tracts of real property, an interest in a time-share, his guns, his business equipment, and approximately $5,500 in personalty. The trial court allocated the mortgage on the marital home and car loan to the wife and ordered her to pay these debts with the proceeds of the sale of the 396.95-acre tract. The court also ordered Mr. Wix to repay the remainder of the marital debt, as well as all the business debts.

The net result of the trial court's division of the marital estate was that Ms. Wix received property worth approximately $198,328 after the mortgage and car loan were repaid. For his part, Mr. Wix received property valued at $114,500 and debts amounting to $151,620. Thus, the debts

Mr. Wix was required to pay exceeded the property he received by approximately $37,120. Stated another way, Ms. Wix received 68.5% of the marital property and was required to be responsible for 64.5% of the marital debt. Mr. Wix received 31.5% of the marital property and was required to be responsible for 35.5% of the marital debt and 100% of the business debt.

**B.**

Trial courts should divide the parties' property and debts after they have awarded the divorce and, if required, have decided on the custody and visitation arrangements for the minor children. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998). Dividing a marital estate necessarily begins with the classification of the property as either separate or marital property. *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996); *McClellan v. McClellan,* 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993). The definitions of "separate property" and "marital property" in Tenn. Code Ann. § 36-4-121(b) (Supp. 2000) provide the ground rules for the task. Once the property has been classified, the trial judge's goal is to divide the marital property in an essentially equitable manner. *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). A division is not rendered inequitable simply because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Bookout v. Bookout*, 954 S.W.2d 730, 732 (Tenn. Ct. App. 1997), or because each party did not receive a share of every piece of marital property. *King v. King*, 986 S.W.2d at 219; *Brown v. Brown,* 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

Dividing a marital estate is not a mechanical process but rather is guided by considering the factors in Tenn. Code Ann. § 36-4-121(c). *Kinard v. Kinard*, 986 S.W.2d at 230. Trial judges have wide latitude in fashioning an equitable division of marital property, *Fisher v. Fisher,* 648 S.W.2d 244, 246 (Tenn. 1983); *Brown v. Brown,* 913 S.W.2d at 168, and appellate courts accord great weight to a trial judge's division of marital property. *Wilson v. Moore,* 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996); *Edwards v. Edwards,* 501 S.W.2d 283, 288 (Tenn. Ct. App. 1973). Thus, we will ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence. *Brown v. Brown,* 913 S.W.2d at 168; *Mahaffey v. Mahaffey,* 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989); *Hardin v. Hardin,* 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983).

In addition to dividing the parties' marital property, the trial court should also allocate the parties' debt as part of the division of the marital estate. *Anderton v. Anderton*, 988 S.W.2d at 679. The parties' debt, like their marital property, should be divided equitably in accordance with the factors in Tenn. Code. Ann. § 36-4-121(c) and in light of (1) which party incurred the debt, (2) the purpose of the debt, (3) which party benefitted from incurring the debt, and (4) which party is better able to repay the debt. *Goodman v. Goodman*, 8 S.W.3d 289, 298 (Tenn. Ct. App. 1999); *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995). Marital debts need not be divided in precisely the same manner as the marital assets, although, where possible, they frequently follow their related assets. *Kinard v. Kinard*, 986 S.W.2d at 233; *King v. King*, 986 S.W.2d at 219; *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989).

## C.

The trial court's explanation of its rationale for dividing the parties' marital estate, for the most part, reflects an appropriate consideration of the factors listed in Tenn. Code Ann. § 36-4-121(c). The court pointed out that the marriage had been one of long duration and that Ms. Wix had made significant non-monetary contributions to the marriage in her roles of wife and mother. It also recognized that Ms. Wix had little education and no marketable skills and that her medical condition left her essentially unable to work. Clearly, Ms. Wix's present and future inability to work would hinder her ability to support herself or to accumulate capital assets in the future. Because Ms. Wix had no separate property to fall back on, the trial court stated that its goal was to leave her debt-free. Under the facts of this case, the trial court's goal was logical and appropriate.

A division of marital property and debts should be undertaken without regard to fault. Tenn. Code Ann. § 36-4-121(a)(1); *Bookout v. Bookout*, 954 S.W.2d at 733; *Brown v. Brown*, 913 S.W.2d at 168. It appears that the trial court's division of the marital estate was, at least in part, grounded on fault considerations. Even though the trial court stated that it was not considering fault, its statements from the bench reflect that fault was very much on its mind. The trial court found that Mr. Wix's "evil" decision to turn his back on his family to pursue Ms. McClain "diverted . . . [his] attention from a healthy logging business and caused it [the logging business] to suffer." Accordingly, invoking Tenn. Code Ann. § 36-4-121(c)(5), the court concluded that "Mr. Wix' choice of pursuing Elizabeth McClain in violation of his marriage vows, which he swore before God, or most likely did if it was a traditional ceremony" amounted to a "dissipation of the marital asset which was a business."[7]

The record does not provide any factual support for the trial court's conclusion that Mr. Wix's relationship with Ms. McClain caused the failure of his business. Mr. Wix testified that his logging business began to fail in 1997 before he ever met Ms. McClain. He explained without contradiction that his business reversals were brought about by several rainy seasons, the difficulty in hiring employees willing to work in rainy and inclement weather, the debt from the purchase of expensive new logging equipment, and the costs of unforeseen repairs to his equipment. Mr. Wix testified that he was unable to earn a profit soon after he purchased the new logging equipment in late 1997 or early 1998. Significantly, Ms. Wix corroborated Mr. Wix's testimony. She testified that she was aware that Mr. Wix's logging business was failing before Mr. Wix met Ms. McClain in August 1998. She attributed this failure to the purchase of "very expensive equipment."

Based on the testimony of both Mr. Wix and Ms. Wix regarding the circumstances surrounding the failure of Mr. Wix's logging business, we find that the trial court erred by concluding that Mr. Wix had dissipated a marital asset as a result of his infatuation with Ms. McClain. However, this error does not undermine the remainder of the trial court's analysis

---

[7]Later in its findings, the trial court repeated that Mr. Wix's "choice to pursue his relationship with Ms. McClain . . . resulted in this inclosion [sic] on [sic] his business. And that will go to be his sole responsibility under - - and that's accorded by the factors 3640121.C. [sic]."

regarding the division of the marital property and the allocation of the parties' debts. Based on our independent review of the evidence, we find no basis for altering the trial court's conclusions that Mr. Wix should be responsible for paying 100% of the business debt and 35.5% of the marital debt and that Ms. Wix should receive the portion of the proceeds of the sale of the parties' 395.96-acre tract remaining after repayment of the mortgage on the parties' marital home and the parties' car note. Accordingly, we affirm the manner in which the trial court divided the marital estate.

## III.
### THE DECISION TO DENY MR. WIX VISITATION WITH HIS CHILDREN

While Mr. Wix does not contest the trial court's decision to award Ms. Wix sole custody of the parties' minor children, he takes issue with the court's refusal to grant him visitation of any sort. He asserts that the evidence preponderates against the trial court's decision and that this decision, if allowed to stand, will impair and diminish his relationship with his children. We agree. Regrettably, the trial court's judgment was affected by its moral disapproval of Mr. Wix's conduct and its desire to use this case to send a message about the sanctity of marriage.

### A.

Neither party in this case was reticent about his or her extramarital relationship. Mr. Wix admitted that his marriage disintegrated after the met and fell in love with Ms. McClain. Throughout the proceeding, he admitted that he and Ms. McClain had been living together practically since he moved out of the marital home in September 1998. For her part, Ms. Wix also admitted that she had been cohabiting with Mr. Sandy since March 1999 in the same house where the minor children were living.

The trial court appears to have been nonplused by the parties' sexual mores. At the conclusion of the November 10, 1999 hearing, the court ordered Mr. Sandy out of Ms. Wix's house and directed Ms. McClain to "hit the road" whenever the children were visiting with Mr. Wix.[8] When the time came to decide on custody and visitation, the parties' conduct was still very much on the trial court's mind. After characterizing Mr. Wix's and Ms. McClain's relationship as "evil," the trial court admonished the parties that

> we've come a long way since the Biblical times, but in the Old Testament the consequence for adultery was death. You can find that in the Book of Deuteronomy. The consequence in modern times is not so great. Now, the consequence is divorce and it appears that has happened.

---

[8] The court also suggested that Ms. McClain could use this time to apologize to her husband and attempt to reconcile.

Later, the trial court added:

> But the court doesn't find any real good thing that's come out of this. I guess, if Mr. Wix is happy, that would be a good thing, but Ms. Wix has not shown happiness to this court, she has suffered greatly, and those children most certainly have because there's been a break in the natural order of things.
>
> The children don't have their father there. And they must totally rely on their mother who is not in the best of health, and it puts a strain on her.
>
> Be that as it may, the court finds it would be totally abominable for this court to do anything but award sole and exclusive custody of the minor children to Ms. Wix.[9]

After awarding Ms. Wix sole custody of the children, the trial court turned to the issue of visitation or what the court referred to as the "hard part of this case." Again, the influence of the trial court's displeasure with Mr. Wix is clear. The trial court reasoned as follows:

> Because of the circumstances of this case, it being that these children were deprived of their father because he decided to choose someone else, and did so in such a cruel way, the court finds that just a willy-nilly adopt-a-standard-visitation-plan for Mr. Wix under these circumstances would send a message to these children that what he did was perfectly okay, and there's proof in the record that this was not okay.
>
>          *             *             *
>
> And in this case there will be no visitation because the court finds that to allow reasonable visitation under these circumstances would send a terrible message to these children. That's the consequence of this case, and that's the court's judgment.

When Mr. Wix's lawyer questioned the visitation decision in light of Ms. Wix's testimony that the children loved their father and that Mr. Wix loved the children, the trial court expanded on the reasons for its decision to deny Mr. Wix visitation. The court stated:

---

[9]The trial court proceeded to reject Mr. Wix's request for joint custody because of the proof that Mr. Wix had "pretty much cut off" Ms. Wix when he "decided to pursue Elizabeth McClain." The trial court also noted that Mr. Wix had "hardly worked at all with Ms. Wix concerning what is in the best interest of the children."

-10-

The court's not making a ruling with respect to legal visitation. Visitation that's covered under the visitation statute. The Tennessee legislature wrote, the court finds that visitation under these circumstances is morally dangerous to these children, and therefore, it will not be set by the court. There will be no visitation that this court will acknowledge or this court will control by court order.

\*       \*       \*

From the standpoint of him having a visitation right, that's contained in an order. He has no visitation rights by law, based upon the evidence and how I understand the case.

If I'm wrong in that regard, the Court of Appeals can correct me in that regard. A case as bad as this, there's got to be a line drawn with respect to the moral integrity of the marriage relationship.

And these children need to know - - and that's how the court is going to make sure that there's no moral endangerment. That when they grow up they know that they should not do the same thing that their father did.

And that's the only way this court knows that message can get out. If, like I said, if Mr. Wix calls up Ms. Wix and says, 'I'd like to see these children.' And she says, 'Come by and let's have dinner.' She's perfectly free to do those kinds of things. That's a non-controlled, nonadjudicated situation.

**B.**

Custody and visitation decisions are among the most sensitive decisions confronting a trial court in a divorce case. *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Rather than calling for heavy handed, authoritarian intervention, *Jones v. Jones*, No. 01A01-9607-CV-00346, 1997 WL 80029, at \*4 (Tenn. Ct. App. Feb. 26, 1997) (No Tenn. R. App. P. 11 application filed), they require trial courts to exercise compassionate and practical judgment to devise an arrangement that will promote the continuation and development of the child's relationship with both parents. *Aaby v. Strange*, 924 S.W.2d 623, 629 (Tenn. 1996); *Taylor v. Taylor*, 849 S.W.2d 319, 331-32 (Tenn. 1993); *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App. 1998). Trial courts must not use these decisions to reward or punish parents. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997); *Turner v. Turner*, 919 S.W.2d 340, 346 (Tenn. Ct. App. 1995).

The goal of custody and visitation decisions is to promote the child's best interests by placing him or her in an environment that will best serve his or her physical or emotional needs. *Luke v.*

*Luke*, 651 S.W.2d 219, 221 (Tenn. 1983). No hard and fast rules exist for determining which custody and visitation arrangement will serve a child's needs best. *Taylor v. Taylor*, 849 S.W.2d at 327 (Tenn. 1993); *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). The inquiry is factually driven and requires the courts to carefully weigh numerous considerations, including those identified in Tenn. Code Ann. § 36-6-106 (Supp. 2000). *Nichols v. Nichols*, 792 S.W.2d 713, 716 (Tenn. 1990); *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988); *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950).

The comparative fitness analysis is not intended to ascertain which parent has been perfect because perfection is as unattainable both in marriage and in parenting as it is in life's other activities. *Rice v. Rice*, 983 S.W.2d 680, 682-83 (Tenn. Ct. App. 1998); *Bush v. Bush*, 684 S.W.2d 89, 93 (Tenn. Ct. App. 1984). Courts understand that parents have their own unique virtues and vices. *Gaskill v. Gaskill*, 936 S.W.2d at 630. Accordingly, we do not expect parents to prove that they are exemplary or that the other parent is completely unfit. Instead, they carefully consider the conduct and circumstances of the parents to determine which of the available custodians is comparatively more fit to have permanent custody of the child. *Earls v. Earls*, 2000 WL 696816, at *6; *Gaskill v. Gaskill*, 936 S.W.2d at 631.

Custody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, appellate courts are reluctant to second-guess a trial court's decisions. Trial courts must be able to exercise broad discretion in these matters, but they still must base their decisions on the proof and upon the appropriate application of the applicable principles of law. *Gaskill v. Gaskill*, 936 S.W.2d at 631; *D v. K*, 917 S.W.2d 682, 685 (Tenn. Ct. App. 1995). Thus, we review these decisions de novo on the record with a presumption that the trial court's findings of fact are correct unless the evidence preponderates otherwise. *Nichols v. Nichols*, 792 S.W.2d at 716; *Doles v. Doles*, 848 S.W.2d 656, 661 (Tenn. Ct. App. 1992).

## C.

The trial court's ruling from the bench following the November 24, 1999 hearing and its final decree leave little room for doubt regarding the basis for its decision to deny Mr. Wix visitation. The trial court perceived that permitting any sort of court-approved personal interaction between Mr. Wix and his children would be "morally detrimental" to the children and that allowing the children personal contact with their father, unless their mother authorizes it, would "send a terrible message to these children." Accordingly, the court refused to define any visitation rights for Mr. Wix in order to vindicate the "moral integrity of the marriage relationship" and to "get the message out" to the children that "they should not do the same thing that their father did."

Mothers and fathers each make unique and complementary contributions to their children's welfare and emotional development. National Interdisciplinary Colloquium on Child Custody Law, *Legal & Mental Health Perspectives on Child Custody Law: A Deskbook for Judges* § 12:1, at 130 (1998) ("*Legal & Mental Health Perspectives on Child Custody Law*"). Accordingly, Tennessee's

General Assembly and courts have recognized that non-custodial parents have a fundamental right to visit their children. Tenn. Code Ann. § 36-6-301 (Supp. 2000); *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998); *Jahn v. Jahn*, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996); *Weaver v. Weaver*, 37 Tenn. App. 195, 202-03, 261 S.W.2d 145, 148 (1953).

Because of the general belief that children will be harmed substantially if denied interaction and relationship with both parents, *Legal & Mental Health Perspectives on Child Custody Law* § 12:2, at 131, Tennessee's courts have repeatedly recognized that custody and visitation arrangements should interfere with the parent-child relationship as little as possible. *Taylor v. Taylor*, 849 S.W.2d at 331; *Pizzillo v. Pizzillo*, 884 S.W.2d 749, 755 (Tenn. Ct. App. 1994). However, a parent's right to visit with his or her children is not absolute. The courts may restrict, suspend, or terminate visitation rights upon the presentation of clear and definite evidence that permitting continued visitation will jeopardize the child physically, emotionally, or morally. Tenn. Code Ann. § 36-6-301; *Suttles v. Suttles*, 748 S.W.2d at 429; *Helson v. Cyrus*, 989 S.W.2d at 707; *Weaver v. Weaver*, 37 Tenn. App. at 202-03, 261 S.W.2d at 148.

Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted. The Tennessee Supreme Court requires that this proof must be "definite," *Suttles v. Suttles*, 748 S.W.2d at 429, and Tenn. Code Ann. § 36-6-301 requires that the proof demonstrate that visitation is "likely" to endanger the child's physical or emotional health. These evidentiary standards have effectively created a presumption against severely circumscribing or denying visitation to non-custodial parents. Such drastic measures are appropriate only when arrangements less detrimental to the parent-child relationship are not available or workable as a practical matter.

With these principles in mind, the courts have terminated or suspended visitation by a non-custodial parent only in extreme circumstances such as (1) the non-custodial parent's history of physically abusing his spouse and child, *Suttles v. Suttles*, 748 S.W.2d at 429; (2) the non-custodial parent's abandonment of the child, *Turner v. Turner*, 919 S.W.2d at 346; *Mimms v. Mimms*, 780 S.W.2d 739, 745 (Tenn. Ct. App. 1989); or (3) conduct of the non-custodial parent that is injurious to the child's physical health, *Smith v. Smith*, No. 03A01-9603-CV-00078, 1996 WL 591181, at *4 (Tenn. Ct. App. Oct. 11, 1996) (No Tenn. R. App. P. 11 application filed). In other circumstances, the courts have stopped short of terminating or suspending visitation when less restrictive alternatives, such as supervised visitation, have been reasonably available. *E.g., Whitaker v. Whitaker*, 957 S.W.2d 834, 838-39 (Tenn. Ct. App. 1997) (disapproving unreasonably burdensome restrictions on visitation on a parent ordered to undergo counseling); *D v. K*, 917 S.W.2d at 685 (approving supervised visitation for a parent who permitted a child to play unattended in a parking lot); *Pizzillo v. Pizzillo*, 884 S.W.2d at 757 (approving supervised visitation for a non-custodial parent convicted of sexual abuse); *Crabtree v. Crabtree*, 716 S.W.2d 923, 927 (Tenn. Ct. App. 1986) (approving supervised visitation for a non-custodial parent charged with sexual abuse).

The trial court's refusal to grant Mr. Wix visitation rights is wholly unsupported by the evidence and is clearly out of step with other similar visitation decisions routinely made by the courts of this state. This record contains no evidence that Mr. Wix's relationship with Ms. McClain (or Ms. Wix's relationship with Mr. Sandy for that matter[10]) has harmed his children physically, emotionally, or morally. Nor is there any evidence in the record that Mr. Wix's conduct has placed the children in jeopardy of such harm or that the children will somehow come to believe that adultery is socially acceptable if their father is permitted to visit with them. The trial court's personal notions of moral rectitude are no substitute for proof of actual or threatened harm to the children.

In fact, neither the parties nor the trial court believe that permitting the children to be in Mr. Wix's presence will harm them in any way. The parties agree that Mr. Wix's visitation was going well until the trial court cut it short. They both profess their affection for the children, and Ms. Wix concedes that the children love Mr. Wix and that they have a good relationship with Ms. McClain. The trial court must not have perceived any inherent danger in permitting Mr. Wix to associate with the children because it told Ms. Wix that she could permit Mr. Wix to visit the children at any time.

We find that the trial court erred by refusing to give Mr. Wix structured visitation. More than anything we have seen in this record, the trial court's actions have seriously and inappropriately undermined the relationship between the Wix children and their father. Accordingly, we reverse this portion of the December 20, 1999 decree and remand the case to the trial court for the purpose of establishing a visitation schedule for Mr. Wix. In the absence of proof that the standard visitation envisioned by the child support guidelines would not be in the children's best interests, Mr. Wix's visitation should, at least, be comparable to the visitation arrangement described in Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(b) (1997).

## IV.
### MR. WIX'S CHILD SUPPORT OBLIGATION

As a final matter, Mr. Wix takes issue with the portion of the trial court's order requiring him to pay $900 per month in child support. He asserts that the trial court had no basis for finding that he was willfully underemployed and adjusting his child support upward because he was not granted visitation. We agree.

Mr. Wix testified without contradiction that he was able to earn approximately $40,000 per year when he was operating his own logging business. However, after his business failed in 1998, he was forced to go to work for another logger. He testified that he was earning approximately $600 per week or $30,000 per year by working as a lumberman for someone else. He also testified that $600 per week was as much as he would be able to make no matter whom he worked for. Notwithstanding this uncontradicted testimony, the trial court determined that Mr. Wix was

---

[10]The trial court also made it clear that it did not condone Ms. Wix's relationship with Mr. Sandy. While the court viewed this relationship as "inappropriate," it concluded it did not "disentitle" her from receiving spousal support because Mr. Wix's "adultery, his vastly, more inimical disrelationship caused the breakup of the relationship."

-14-

voluntarily underemployed because he had "set about on a course to destroy his business situation by pursuing an adulterous relationship." We have already concluded that the trial court's notion that there is a causal connection between the failure of Mr. Wix's business and his involvement with Ms. McClain has no factual support and is contradicted by the testimony of both Mr. Wix and Ms. Wix. Accordingly, we now find that the trial court's conclusion that Mr. Wix willfully became underemployed because of his relationship with Ms. McClain likewise lacks any evidentiary support.

Despite the lack of support for the trial court's stated reason for concluding that Mr. Wix was voluntarily underemployed, we have reviewed the record ourselves using the proper legal standards to determine whether Mr. Wix is, in fact, voluntarily underemployed. Tenn. Comp. R. & Regs. r. 1240-2-4-.02(3)(d) (1994) permits the courts to calculate an obligor parent's child support based on the spouse's "potential income" if the parent is "willfully and voluntarily unemployed or underemployed." Determining whether a person is willfully and voluntarily underemployed is a fact-driven inquiry requiring careful consideration of all the attendant circumstances. *Ralston v. Ralston*, No. 01A01-9804-CV-00222, 1999 WL 562719, * 3 (Tenn. Ct. App. Aug. 3, 1999) (No Tenn. R. App. P. 11 application filed).

Clearly, obligor parents will not be permitted to avoid their child support obligations by liquidating their businesses simply to evade paying child support, *Brooks v. Brooks*, 992 S.W.2d 403, 406 (Tenn. 1999), or to stop working or to take a lower paying job without good reason. *Garfinkel v. Garfinkel*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996). Accordingly, the courts must scrutinize the reasons for the obligor parent's career decision, *Creson v. Creson*, No. 02A01-9801-CH-00002, 1999 WL 65055, *5 (Tenn. Ct. App. Feb. 12, 1999) (No Tenn. R. App. P. 11 application filed); *McGaffic v. McGaffic*, No. 03A01-9707-CV-00286, 1997 WL 772899, *4 (Tenn. Ct. App. Dec. 9, 1997) (No Tenn. R. App. P. 11 application filed); *Ford v. Ford*, No. 02A01-9507-CH-00153, 1996 WL 560258, *4 (Tenn. Ct. App. Oct. 3, 1996) (No Tenn. R. App. 11 application filed), and the reasonableness of his or her ultimate career choice. *Narus v. Narus*, No. 03A01-9804-CV-00126, 1998 WL 959839, * 2 (Tenn. Ct. App. Dec. 31, 1998) (No Tenn. R. App. P. 11 application filed).

We find no evidence in this record that Mr. Wix willfully caused or permitted his logging business to fail simply to avoid paying child support. His logging business was in decline when he met Ms. McClain, and he provided detailed, persuasive reasons for his business's failure over which he had no control. Accordingly, we have concluded that the record does not support a conclusion that Mr. Wix is willfully and voluntarily underemployed for the purpose of Tenn. Comp. R. & Regs. r. 1240-2-4-.02(3)(d) and, therefore, that his child support obligation should have been based on his uncontradicted testimony that he was earning approximately $30,000 at the time of the 1999 hearing.

The trial court also increased Mr. Wix's child support by invoking Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(b) which permits increasing child support if the obligor parent is not exercising visitation for the "average visitation period." We have already determined that the trial court erred by failing to grant Mr. Wix standard visitation and have remanded the case to the trial court for the purpose of granting standard visitation to Mr. Wix. Accordingly, the trial court had no factual basis for invoking Tenn. Comp. R. & Regs. r. 1240-2-4-.04(1)(b).

Based on Mr. Wix's uncontradicted testimony that he was earning $30,000 at the time of trial, the trial court should have set his child support obligation at $610.88 per month or $142 per week. On remand, we direct the trial court to enter an order setting Mr. Wix's child support at that amount unless Ms. Wix can demonstrate that there is a significant variance between that amount and the amount that Mr. Wix would be paying based on his current salary. Based on the presumption that the child support payments Mr. Wix has been making as a result of the December 20, 1999 order have inured to the benefit of his minor children, Mr. Wix may not seek a refund for any overpayments he has made.

## V.

We affirm the division of the marital estate and the apportionment of the marital debts. We reverse the denial of Mr. Wix's request for structured visitation and reverse the portion of the order setting Mr. Wix's child support at $900 per month. The case is remanded to the trial court to forthwith enter an order granting Mr. Wix visitation and setting his child support in accordance with this opinion and for whatever other proceedings may be required. We tax the costs to Cathy Marie Wix for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

-16-