IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
On-Brief October 19, 2004 Session

## IN THE MATTER OF B.A.L. and A.E.L.

**A Direct Appeal from the Juvenile Court for Shelby County**
**No. F6943 The Honorable Herbert Lane, Special Judge**

_____

**No. W2004-00826-COA-R3-JV - Filed December 23, 2004**

_____

This is a child custody case. Father/Appellant appeals from the trial court's Order, which denied Father/Appellant's Petition to change custody from the minor children's Mother to Father. Finding that there is not a material change in circumstances to warrant a change of custody, we affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which ALAN E. HIGHERS, J. and DAVID R. FARMER, J., joined.

William T. Winchester of Memphis for Appellant, Craig A. Lott

Charles A. Sevier of Memphis for Appellee, Countess Jeanine Fleming

**OPINION**

On or about August 21, 1994, Craig A. Lott ("Lott," "Father," or "Appellant") and Countess Jeanine Fleming ("Fleming," "Mother," or "Appellee") executed a "Voluntary Acknowledgment of Paternity of a Child" as to A.E.L. (d.o.b. 8/19/94). On December 28, 1994, the trial court entered an "Order of Legitimation," declaring A.E.L. to be the natural child of Lott. A second minor child, B.A.L. (d.o.b. 9/16/92), had been legitimated as Lott's child on July 19, 1993.

On October 6, 1995, Fleming filed a "Petition to Modify Order," seeking to modify the December 28, 1994 Order to include provisions for payment of health insurance and child support by Lott. On October 23, 1995, the "Findings and Recommendations of the Referee" were confirmed as the decree of the trial court and Lott was ordered to pay $756.00 monthly in child support. On October 23, 1995, Lott requested a hearing before the Judge. A hearing was granted and the October 23, 1995 Order was modified on November 20, 1995 to require Lott to pay $666.75 per month in

child support. On December 21, 1995, an "Income Assignment Order" was entered, authorizing deduction from Lott's paycheck to cover arrearage and ongoing child support.

On January 25, 1996, Lott filed a "Petition to Establish Paternity, Request for Blood Test and to Schedule Visitation [in the event that blood tests revealed Lott's paternity]" as to A.E.L. By Order of March 7, 1996, all parties were required to submit to blood tests. The blood tests revealed Lott to be the natural father of A.E.L. and, on May 16, 1996, the trial court entered an Order, which reads, in relevant part, as follows:

> IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED
> 1. That said child(ren) shall be a legitimate child(ren) of the defendant for purposes of inheritance, support, and all other lawful purposes and that custody of said child(ren) be awarded to the mother.
>
> 2. That the defendant pay all medical expenses incident to the birth of said child(ren) and that he pay $635.20 monthly, Clerk's fee included, to the Clerk of Court toward the support of said child and another child previously legitimated on July 19, 1993, docket number D9203, beginning May, 1996, and that future payments be made by income assignment. Unless specifically ordered by the Court, such support shall not be reduced or prorated.
>
> 3. That the defendant shall provide medical insurance for the child(ren), or in the alternative, that he be responsible for the child(ren)'s medical expenses.
>
> 4. That the surname of said child(ren) be changed to that of the defendant, the natural father of said child(ren).
>
> 5. That the defendant shall reimburse the State for blood tests in the amount of $165.00.
>
> 6. That the father of said children, Craig Anderson Lott, shall have visitation privileges with said children every other week from 6:00 P.M. Thursday until 6:00 P.M. Friday, in Memphis, at the home of the paternal grandparents.
>
> 7. That the defendant shall pay the costs for which execution may issue.

A second "Income Assignment Order" was executed on June 6, 1996 to replace the December 21, 1996 Order and to reflect the change in support obligation evinced by the May 16, 1996 Order.

On February 3, 2003, Fleming filed a "Motion to Modify Order," seeking to increase Lott's child support obligation. The "Findings and Recommendations of Referee," which increased Lott's monthly child support to $881.20, were confirmed as the decree of the trial court on February 25, 2000. On February 25, 2000, Lott requested a hearing before the Judge. Following a hearing, the Referee's ruling of February 25, 2000 was reconfirmed by Order of March 23, 2000. An "Amended Income Assignment Order" had been entered on March 2, 2000 to reflect the increase in Lott's support obligation.

On January 30, 2003, Lott filed a "Petition to Establish and/or Modify Custody and/or Visitation," (the "Petition). The Petition reads, in pertinent part, as follows:

> 1. Petitioner is the natural father of the minor children, who currently reside with the Respondent, the natural mother.
>
> 2. There have been prior proceedings establishing paternity for both children under this docket number, and Docket Number D9203. Pursuant to the establishment of paternity and legitimization, visitation for the Petitioner and child support were set.
>
> 3. There has never been a hearing on custody, but custody is with the Respondent pursuant to Tennessee law regarding children born out of wedlock.
>
> 4. Petitioner requests that this Court conduct an initial custody determination for the minor children, or alternatively, Petitioner avers that a material change of circumstances has occurred which warrants a change in custody or a modification of visitation.

On February 26, 2003, Fleming filed a "Motion to Modify Order," again seeking an increase in child support. On June 12, 2003, the trial court entered an Order based on the Referee's Findings and Recommendations, which modified Lott's visitation. On June 12, 2003, Lott requested a hearing before the Judge. On July 1, 2003, the Findings and Recommendations of the Referee, raising Lott's child support obligation to $1,055 per month, were confirmed by the trial court.

On or about August 28, 2003, the trial court, with the Juvenile Court Special Judge presiding, began the requested rehearing; however, the matter was recessed so that a Guardian ad Litem could be appointed. A Guardian ad Litem was appointed by Order of September 3, 2003.

On October 9, 2003, after completing the hearing, the trial court entered an Order, which "reconfirmed" the Referee's June 12, 2003 recommendation.[1] On November 10, 2003, Lott filed a "Motion to Alter or Amend Judgment," which reads, in pertinent part, as follows:

1. Petitioner is the natural father of the minor children.

2. At the hearing of this cause, the Court indicated that it would have changed custody from the Mother to the Father but for the recommendation of the Guardian Ad Litem.

3. The material facts ascertained at the hearing of this matter include the following:

a. Tamara Golden, Mother's sister, testified that the Mother had, on numerous occasions, left the minor children at home alone, and that sister went over to take the minor children to school.

b. Tamara Golden, Mother's sister from Memphis, testified that the Mother does not allow the minor children to visit with Mother's own family.

c. Roslyn Fleming, Mother's sister from California, testified that Mother walked around the house naked while Mother's boyfriend and minor children were present.

d. Roslyn Fleming, Mother's sister from California, testified that Mother told the minor son that Mother was going to send him to boarding school.

e. Milton Lott, Father's father, testified that Mother interfered with Father's visitation time, and on one occasion, called the police demanding that he turn over the children to Mother even though it was still Father's visitation time.

f. Lubertha Lott, Father's mother, testified that Mother calls on numerous occasions during Father's visitation time.

g. Lubertha Lott, Father's mother, testified that [Father] lives with his parents, that the house is large enough to accommodate the children, and that the Father has a great relationship with the minor children.

---

[1] Paragraph #2 of the Referee's Findings required Father to transport the children to and from extracurricular activities. This paragraph was not "reconfirmed" by the October 9, 2003 Order.

h. Father testified that Mother routinely interferes with his visitation, that Mother plans activities for the minor children during Father's visitation time, and that Mother has on several occasions denied his visitation.

i. Father testified that he has a great relationship with his children, and that they want to live with him.

j. Mother testified that she did not think anyone had a right to interfere with her parental authority.

k. Mother admitted th[at] she has, on many occasions, left the minor children at home alone, but th[at] she did not have any concerns about the children's safety while they were home alone.

l. Mother testified that everyone that had testified in this case, except her and her witnesses, had lied. This includes Mother's sisters.

m. Mother admitted that she had scheduled activities for the minor children during father's visitation, including the Father's summer visitation during which he wanted to take the children to his family reunion.

n. At the conclusion of the hearing, Mother stood up and stated that the minor son wanted to live with his Father, at which time Mother's attorney stopped her from talking.

4. "A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances which make the parenting plan no longer in the best interest of the child. Tennessee Code Annotated § 36-6-101(a)(2)(B) (emphasis added).

FROM ALL, Father avers that a material change of circumstances has occurred which warrants a change of custody, and requests this Court to alter or amend its judgment and award Father custody of the minor children.

By Order of March 25, 2004, the trial court denied Lott's Motion to Alter or Amend. Lott appeals and raises two issues for review as stated in his brief:

1. Whether the trial court erred in requiring the Father to prove a material change of circumstances in order to modify custody where there had never been a hearing on custody.

2. Whether the trial court erred by not finding that there was a material change in circumstances that warranted a change in custody, and by not placing the minor children in the custody of the Father.

We first note that, since this case was tried by a court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d).

## No Custody Hearing

Lott first asserts that, because the trial court allegedly never conducted an initial hearing to determine custody, the trial court should not have required Lott to show a material change in circumstances. We disagree. First, Paragraph number one of the May 16, 1996 Order, *see supra*, clearly establishes custody with the Mother. Therefore, there has been a prior judicial determination regarding custody. However, even absent this May 16, 2003 Order, T.C.A. § 36-2-303 (2001) indicates that "[a]bsent an order of custody to the contrary, custody of a child born out of wedlock is with the mother." Consequently, custody would have been with the Mother from the respective birthdays of these children regardless of a court order. Father's failure to raise an issue concerning the trial court's determination of custody and/or the statutory default regarding custody to the Mother at any time from the birth of these children (1992 and 1994 respectively) until his Petition in this case, constitutes a waiver. This issue is, consequently, without merit.

## Material Change in Circumstances

In child custody cases, the law is well established that when a decree awarding custody of children has been entered, that decree is *res judicata* and is conclusive in a subsequent application to change custody unless some new fact has occurred which has altered the circumstances in a material way so that the welfare of the child requires a change of custody. ***Long v. Long***, 488 S.W.2d 729 (Tenn .Ct. App.1972). In short, once the trial court has made an initial determination with respect to custody, it cannot entertain a subsequent petition to modify custody absent a material change in circumstances such that the welfare of the child demands a redetermination. ***See, e.g., Massengale v. Massengale***, 915 S.W.2d 818, 819 (Tenn. Ct. App.1995). A "material change in circumstances" justifying modification of a child custody order may include factors arising after the initial determination or changed conditions that could not be anticipated at the time of the original order. ***See Blair v. Badenhope***, 940 S.W.2d 575, 576 (Tenn. Ct. App.1996) (citing ***Dalton v. Dalton***, 858 S.W.2d 324, 326 (Tenn.Ct.App.1993)). If the trial court finds that there has been a material change in circumstances, it will then consider the petition to modify custody using a best interest standard. ***Woolsey v. McPherson***, No. 02A01-9706-JV-00125, 1998 WL 760950, at \*2 (Tenn. Ct. App.Nov.2, 1998). As this Court has previously recognized, there is a strong presumption in favor

-6-

of the existing custody arrangement. *Smithson v. Eatherly*, No. 01A01-9806-CV-00314, 1999 WL 548586 at *2 (Tenn. Ct. App. July 29, 1999) (citing *Taylor v. Taylor*, 849 S.W.2d 319, 332 (Tenn.1993)). The party seeking to change the existing custody arrangement has the burden of proof to show both that the child's circumstances have materially changed in a way that was not reasonably foreseeable at the time of the original custody decision and that changing the existing custody arrangement will serve the child's best interests. *Geiger v. Boyle*, No. 01A01-9809-CH-00467, 1999 WL 499733 at *3 (Tenn. Ct. App. July 16, 1999) (citing *Smith v. Haase*, 521 S.W.2d 49, 50 (Tenn.1975.)); *McDaniel v. McDaniel*, 743 S.W.2d 167, 169 (Tenn. Ct. App.1987); *Hall v. Hall*, No. 01A01-9310-PB-00465, 1995 WL 316255, at *2 (Tenn. Ct. App. May 25, 1995). Under this standard, the primary inquiry is whether there has been a material change in the child's circumstances. Although there is no concrete definition for what constitutes a material change of circumstances, this Court has enumerated several factors that should be taken into consideration when determining whether such a change has occurred. In general, the change must occur after the entry of the order sought to be modified and the change cannot be one that was known or reasonably anticipated when the order was entered. *Turner v. Turner*, 776 S .W.2d 88, 90 (Tenn. Ct. App.1988); *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App.1993). In addition, the material change in circumstances must be a change in the child's circumstances, not the circumstances of either or both of the parents. *McCain v. Grim*, No. 01A01-9711-CH-00634, 1999 WL 820216 at *2 (Tenn. Ct. App.Oct.15, 1999). Finally, the change must affect the child's well-being in a material way. *Dailey v. Dailey*, 635 S.W.2d 391, 393 (Tenn. Ct. App .1981). Tennessee courts have based modification of child custody decrees on the following criteria: the character of the custodian; the conduct of the custodian; and the child's welfare. *Townshend v. Bingham*, No. 02A01-9801-CV-00019, 1999 WL 188290, at *4 -*5 (Tenn. Ct. App. Apr.6, 1999). The child's preference is only one factor to be considered in deciding custody. See T.C.A. § 36-6-106 (2001); *Wilson v. Wilson*, 987 S.W.2d 555, 564 (Tenn. Ct. App.1998); *Helson v. Cyrus*, 989 S.W.2d 704, 707 (Tenn.Ct.App.1998). The party seeking a change in custody has the initial burden to show a material change of circumstances which affects the welfare of the child. *Harris v. Harris*, 832 S.W.2d 352, 352 (Tenn.Ct.App.1992). The burden remains on the moving party to show that he or she is comparatively more fit than the party with custody under the challenged custody decree and to show that it would be in the child's best interests for the moving party to be the custodial parent. *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451 at *4, (Tenn. Ct. App. July 21, 1999) (citing *Nichols v. Nichols*, 792 S.W.2d 713, 715 (Tenn.1990)); *Rust v. Rust*, 864 S .W.2d 52, 56 (Tenn.Ct.App.1993).

The record before us in this case is incomplete in that there is no transcript of the first part of the hearing, which occurred on August 28, 2003. It is well settled that it is the responsibility of the Appellant to present to this Court a full and complete record on appeal. In the absence of the aforementioned transcript, this Court is in the difficult position of deciding a fact-driven case without the benefit of the entire testimony adduced at the hearing. However, the transcript before this Court does contain the following, relevant, information, concerning what transpired at the August 28, 2003 hearing:

THE COURT: ...Tell me what you recall of our last hearing...

*                          *                          *

MR. WINCHESTER [attorney for Lott]: First, the father testified with regards to his concerns about the way the mother was caring for the children. He testified as to her written appearance with his regular scheduled visitation with the children, that she was constantly scheduling things during his visitation where he didn't do much of anything (inaudible) what she told him to do.

The father testified that the children were doing–were they in school and that she was–the mother had been leaving the children at home sometimes by themselves. And that's where one of the sisters, Tamara Golden, picked up with regards to the mother leaving the children at home alone by themselves. In some instances, the mother–Ms.–excuse me, I'm sorry–Ms. Golden would have to go over to the children's house because they would call her in the morning saying they missed the bus, and she would take them to school.

There were some instances where the mother pretty much cut off contact with Ms. Golden because of Ms. Golden's helping the children. There was one instance where Ms. Golden took the children to the–I'm not sure; I've got an abbreviation here–to the doctor or the dentist because Ms. Fleming would not do so.

Then there was another issue–there was another issue coming from the sister from California where she would be at home. She would visit sometimes and Ms. Fleming would be laying around the house without any clothes on in front of the children while her boyfriend was living there, as well. There was [sic] instances where the children were having to go iron clothes and stuff of that nature and sometimes in the dark. And then at that point is when the Court decided to appoint a Guardian ad Litem.

THE COURT: And Ms. Kirk [attorney for Fleming], do you want to tell me what your recollections of the proof are?

MS. KIRK: I don't have in my notes anything about the trip to the dentist. I don't know if that's just something I missed. I do have that there was one time that the children–she [Ms. Golden] had to pick the children up in the morning. They called her because they missed the bus. I did have in my notes that they [Fleming and Ms. Golden] were not close and that they don't talk to each other very much....

-8-

         \*                    \*                    \*

I also have notes from her [Rosalyn Fleming, Fleming's sister from California's] testimony that she [Fleming] walks around with no clothes on. I asked her a specific date of when this happened. She could not give me any date, nor could she give me any specific dates of when she was particularly there to visit.

I do have in my notes that she had resisted questions about their [Rosalyn Fleming and Fleming's] relationship and that basically she did say that they don't talk very much and haven't for a couple of years, at least.

THE COURT: And I have notations in addition to that. She [Rosalyn Fleming] said that the mother of the children made the children feel unwanted, that she was constantly telling [B.A.L.] that [Mother was going to send him to boarding school].

From the testimony that we do have before us in the transcript, it is very apparent that there is a great deal of acrimony between Mr. Lott and Ms. Fleming. It is also apparent that both of these parties have very definitive ideas about parenting, which rarely overlap. In terms of the circumstances that Lott has alleged as constituting a material change such that custody should be removed from Fleming, we find those fact to be largely disputed in the record before us. Although Fleming admits that she would leave the children in the house alone from approximately 6:40 A.M. until they left for the bus at 7:25 A.M., the record reveals that this arrangement has ceased now that Fleming is teaching at a new location. The testimony from Fleming's sisters is certainly not flattering to her; however, there is evidence to suggest that Fleming and her sisters are estranged. Likewise, the testimony of Mr. Lott's parents, that the children were not always kempt, is disputed by the respective testimonies of Maria Johnson and Patricia Jones. It is well settled that when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

The testimony of the Guardian ad Litem suggests that Fleming's conduct, although not textbook parenting, does not rise to the level of emotional abuse or neglect. The Guardian ad Litem, as well as the trial court, also expressed concern about Lott discussing court matters with the children. In short, neither of these parents is perfect but, at the same time, either home would be suitable for these children. Since custody was established with Ms. Fleming, the burden in this case is on Mr. Lott to show a material change of circumstances which affects the welfare of the children.

*Harris v. Harris*, 832 S.W.2d 352, 352 (Tenn.Ct.App.1992). The burden remains with Mr. Lott to show that he is comparatively more fit than the Ms. Fleming such that it would be in these children's best interests for custody to be removed from Ms. Fleming. *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451 at *4, (Tenn. Ct. App. July 21, 1999) (citing *Nichols v. Nichols*, 792 S.W.2d 713, 715 (Tenn.1990)); *Rust v. Rust*, 864 S .W.2d 52, 56 (Tenn.Ct.App.1993). From the entire record before us, we cannot say that Mr. Lott has met this burden.

For the foregoing reasons, we affirm the Order of the trial court. Costs of this appeal are assessed against the Appellant, Craig A. Lott, and his surety.

_____
W. FRANK CRAWFORD, P.J.,W.S.