IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 5, 2024

FILED
MAR 1 3 2025
Clerk of the Appellate Courts
REc'd By /KDoyal

**IN RE KENDIN L.**

Appeal from the Juvenile Court for the City of Bristol
No. BCJ-17404      Randy M. Kennedy, Judge

_____

No. E2024-00209-COA-R3-JV

_____

Rhonda L. ("Mother") filed a petition in the Juvenile Court for the City of Bristol ("the Juvenile Court") to modify a parenting plan granting Mark K. ("Father") sole custody of Kendin L. ("the Child") and Mother at least four days of parenting time each month.[1] Father filed a motion for injunctive relief seeking the suspension of Mother's parenting time based upon Mother's persistent inappropriate behavior and psychological evaluation results. The Juvenile Court entered an *ex parte* order granting the motion for injunctive relief. After trial, the Juvenile Court dismissed Mother's petition for her failure to prosecute and ordered that the suspension of Mother's parenting time remain in full effect until Mother engaged in therapy and treatment for her personality disorder. Mother appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and J. STEVEN STAFFORD, P.J., W.S., joined.

Rhonda L., Morristown, Tennessee, Pro Se.

Jason A. Creech, Johnson City, Tennessee, for the appellee, Mark K.

---

[1] Throughout this Opinion, we use the initials of the last names of the Child and parties to protect the Child's identity and privacy.

# OPINION

## Background

This custody and visitation case has a long and contentious history beginning in Kentucky, where Father and Mother had an extra-marital affair. When Father and Mother's relationship began, Father was working as an eye surgeon at the University of Kentucky and was married to Blythe S. ("Wife") with whom he had two children, a son and a daughter. Father's years-long affair with Mother culminated in the pregnancy and birth of the Child in 2017.

The relationship between Father and Mother turned contentious and, in December 2019, the Fayette Circuit Family Court in Kentucky ("Kentucky Court") awarded Father sole custody of the Child. By the time the Kentucky Court entered this order, Father and his family had moved to Sullivan County, Tennessee. In March 2020, the Kentucky Court entered an agreed order for Mother to undergo a psychological evaluation. The Kentucky Court entered an order of protection against Mother in favor of Father and his son and daughter.

The Kentucky Court also entered an order prohibiting Mother from posting material that contained the name and likeness of the Child on any publicly accessible social media platform. It ordered Mother to make "'private', i.e. set to be accessible only to 'friends', any material with commentary that tends to lead the viewers to believe that the child is in danger and cease from posting commentary of the sort in the future, even if the setting is private."

On June 9, 2020, Mother filed a petition, requesting the Juvenile Court to name her the primary residential parent and approve and adopt her proposed parenting plan allocating her 285 days of parenting time. On the same day, she filed a motion in the Kentucky Court to transfer the case to the Juvenile Court. She noted that all parties and the Child had moved to Tennessee. At that point, Mother's motions to alter or amend and for a new trial were pending in the Kentucky Court. On June 10, 2020, the Kentucky Court entered an order denying those motions, with the exception of adding the requirement that Father provide at least four days of visitation per month for Mother.

Father filed a response and a petition to enroll the Kentucky Court's orders in the Juvenile Court. Father alleged that Kentucky had lost continuing, exclusive jurisdiction given that Mother had not appealed the Kentucky Court's final order and all parties and the Child had left the state of Kentucky. Father argued that the Juvenile Court had the power to modify the Kentucky Court orders after receipt of Mother's psychological evaluation and the power to hold Mother in contempt if she did not complete the court-ordered psychological evaluation.

In response to Mother's petition, Father argued that Mother would not be able to show a material and substantial change in circumstances; Mother was not receiving mental health treatment; Mother was obsessed with Father; and Mother had moved to Tennessee to forum shop, find a different judge, and re-litigate past issues already decided by the Kentucky Court.

Father then filed a motion to dismiss Mother's petition and for sanctions. Father noted that he had recently learned that Mother appealed the Kentucky Court's orders to the Kentucky Court of Appeals. Father claimed that Mother was "shamelessly forum shopping," asked the Juvenile Court to dismiss her petition, and asked the Juvenile Court to award him sanctions for having to defend the petition. Alternatively, Father asked the Juvenile Court to stay Mother's petition pending the outcome of her appeal to the Kentucky Court of Appeals.

In July 2020, Father filed a motion to change the Child's surname from Mother's surname to Father's, primarily citing Mother's inappropriate publicization of the custody dispute over the Child on the internet. Mother allegedly "flooded" the internet with the Child's name and likeness and insinuated that the Child was in danger, was taken, and needed to be rescued.

In September 2020, the Juvenile Court appointed a guardian *ad litem* ("GAL") for the Child. In October 2020, the Juvenile Court entered an order enrolling the Kentucky Court orders, noting that the parties had stipulated that Tennessee shall assume jurisdiction over the matter, and ordering Mother to obtain a psychological evaluation per the Kentucky Court's March 2020 order.

In November 2020, Father filed a motion for criminal contempt and to compel production of computers. Father alleged that Mother had willfully violated the Kentucky Court's order prohibiting her from posting the Child's name and likeness online. Father alleged that Mother had posted about the Child on her public Twitter page, "painting herself and the minor child as victims and to achieve national news attention." Father also alleged that Mother had previously published hundreds of publicly available YouTube videos of the Child calling for the Child's "rescue." These videos remained online. Father alleged that Mother tried to attract the attention of certain CNN reporters online and contacted a reporter from a newspaper in Kentucky. Father further alleged that Mother had sent an email to Father's daughter's school administrator detailing the custody battle and alleging that Father and Wife had attempted to buy the Child. Mother also lodged a complaint against the medical license of Father.

In addition to a finding of criminal contempt, Father requested that the Juvenile Court order Mother to turn over any and all computers and/or smart phones she had used in the past twelve months for a forensic analysis performed by a computer expert. Father noted that Mother had attempted to hide behind fake emails and online anonymity in order

to advance what she called a "War of Attrition" against Father and that obtaining her digital activity by a forensic computer expert would assist the Juvenile Court in showing the "depths and depravity" of Mother's conduct.

In March 2021, Father filed a motion for civil contempt and a supplement to his pending motion for criminal contempt. He alleged that the parties had agreed on a provider to conduct Mother's psychological evaluation but that Mother had failed to schedule the evaluation. He supplemented his motion for criminal contempt by adding allegations of Mother's continued "pattern of obsession and harassment" of his family, including an allegation that Mother had contacted the school of Father and Wife's son. A few months later, Father filed a second supplement to his motion for criminal contempt, alleging that Mother had persisted in her harassment of his family by, again, contacting Father and Wife's son's school.

The Juvenile Court granted Father's motion to compel, ordering Mother to turn over any and all laptops and/or cell phones and/or other electronic devices that she had used since June 1, 2020 for a forensic evaluation. The Juvenile Court held Father's motion for criminal contempt in abeyance to allow time for electronic discovery. The Juvenile Court ordered Mother to schedule her psychological evaluation by July 1, 2021, and held Father's motion for civil contempt in abeyance pending Mother's compliance.

In July 2021, Father filed a motion for discovery sanctions and dismissal of Mother's petition due to fraud upon the Juvenile Court. Father alleged that Mother had provided someone else's phone for forensic evaluation. Tom Farrow, Father's private investigator, determined that Mother had provided someone else's phone and replaced the SIM card in the phone prior to inspection. He also alleged that the planned psychological evaluation provider had refused to conduct the evaluation and that Mother had not yet provided any substitute provider or shown any effort to remedy the problem despite the passing of her deadline to schedule an evaluation. Father claimed that Mother had displayed "ambivalence, avoidance and/or outright fraud" upon the Juvenile Court.

Father later filed a motion for sanctions and dismissal of Mother's petition due to spoliation of evidence, referring to Mother's answer to an interrogatory to list every cell phone she had owned since Jan. 1, 2020. Mother answered: "Judy L[.] [Mother's mother] bought and owns the phones. She threw all phones in Cherokee Lake after all phones were hacked."

In November 2021, Mother filed a motion to recuse the Juvenile Court judge, Judge Randy Kennedy, alleging that Judge Kennedy's wife was an "Instagram friend" with Wife, creating an appearance of impropriety. A month later, the Juvenile Court entered an order denying Mother's motion for recusal, and made the following findings of fact:

- 4 -

1. On June 7, 2021, this Judge announced in open court, and on the record, this Judge and his family live in the same gated community as the Respondent. This Judge's wife was out for a summer walk with the family dog and came upon Blythe S[.], Respondent's wife. Basically, the women introduced themselves to one another. This Judge asked his wife to have no further contact with Ms. S[.], because of the pending matter. After this announcement in Court, the attorneys for the parties stated they had no objection.

2. On November 8, 2021, Petitioner's attorney filed a Motion to recuse based upon:

   a. The Judge's wife "is an Instagram friend of Ms. S[.]".

   b. From the Instagram account "I have seen, it is clear" the women are friends. I note here that such allegations are made without supporting documentation for the Court to consider.

3. This Judge sought clarification from his wife, since this Judge does not follow social media. It appears the allegations are made based upon certain "thumbs up" "Likes" or "smiley face emoji" (3-4 total) of certain products my wife sells (i.e. wine sales)[.] There has been no communication and there is no friendship.

4. Had the Motion not been filed, this Judge would never have known of the "thumbs up" "Likes" or "smiley face emoji".

Mother filed a second motion for recusal, arguing that Judge Kennedy's wife used her "Instagram business account" to like four posts on Wife's "Instagram business account" throughout September and October 2021, after Judge Kennedy had announced that he asked his wife to have no further contact with Wife. The Juvenile Court entered an order denying this motion, concluding:

3. Had the previous Motion to Recuse and the Second Motion to Recuse not been filed, this Judge would never have known of the "Likes".

4. "Posts" are not conversations and do not create a friendship or relationship of any kind between the Judge's wife, and the Petitioner's wife, as alleged by Petitioner's counsel.

5. This Judge is not prejudiced or biased because his wife "Likes" a "Post".

In July 2022, the Juvenile Court entered an order addressing Father's motions for criminal contempt, for civil contempt, to change the Child's surname, to extend the order of protection, and for sanctions. The Juvenile Court found Mother in willful contempt of court by failing to provide the digital information required of her by prior court order. The Juvenile Court reserved ruling on any punishment for her contempt. The Juvenile Court found that the motion for civil contempt had been partially resolved because Mother finally completed her psychological evaluation. The Juvenile Court reserved requests for attorney's fees related to that motion for trial. The Trial Court granted Father's motion to extend the order of protection. The Juvenile Court set a hearing for the motion to change the Child's surname.

Father filed a motion requesting that the Juvenile Court restrict Mother to supervised visitation, noting that the parties had utilized third-parties for exchanges of the Child between Mother and Father; that two third-party providers had quit due to Mother's behavior in the past year; that the most recent third-party exchange provider quit due to Mother's refusal to follow company policies and her hostile and confrontational behavior with the company's supervisors; that Mother had become increasingly agitated and confrontational with exchange supervisors; and that Mother had told the Child he would no longer be able to live with Father, causing the Child "great confusion and emotional distress." Father alleged that Mother's "aggressive and wildly inappropriate" behavior would cause the Child irreparable harm absent an order restricting her visitation to supervised visitation.

Shortly thereafter, Father filed a motion for injunctive relief to suspend Mother's parenting time pending receipt of her psychological services, and for criminal contempt. Father alleged that on August 30, 2022, Mother sent a mass email to "seemingly random recipients" including various attorneys with no relationship to the case, an Assistant United States Attorney, multiple media companies, a reporter for the Courier Journal in Kentucky, the Pigeon Forge Chamber of Commerce, and two emails associated with the actress Angelina Jolie. The email was an "unhinged, rant-like proclamation," alleging that Father had offered to purchase the Child from Mother for $300,000; bribery; and judicial conspiracy and misconduct. The email included links to videos of the Child, two of which included Mother "interrogating" the Child.

Father alleged that Mother was in criminal contempt due to her continued willful violation of the Juvenile Court's orders and that Mother's mental health was in spiral, placing the Child in a dangerous situation. Father, accordingly, asked the Juvenile Court to suspend Mother's parenting time until she received comprehensive and complete psychological care. The Juvenile Court entered a show cause order, ordering Mother to appear on December 7, 2022, to demonstrate why she should not be held in willful contempt of the Juvenile Court's orders.

- 6 -

Mother's counsel filed a motion to withdraw as her counsel, explaining that Mother no longer wished to be represented by him. The Juvenile Court granted the motion and gave Mother thirty days to retain new counsel. Mother proceeded pro se.

Father filed an amended motion for injunctive relief in November 2022. He alleged that Mother had continued to send out mass emails, alleging child exploitation and abuse; collusion against her by attorneys, judges, and police departments being paid by Father; and collusion by Judge Kennedy, Father, Father's counsel, Mother's former counsel, and the GAL to place Mother in jail and terminate her parental rights. Another video of the Child was also sent out.

Father also alleged that Mother had repeatedly called the Bristol Police Department to conduct welfare checks on the Child. Father stated that each time the police department conducted one of these welfare checks, the Child was found unharmed.

Mother filed a motion to dismiss Father's amended motion for injunctive relief. She also filed a motion to hold Father in contempt for failing to provide her with her monthly visitation.

The Juvenile Court entered an order in January 2023, explaining the events of the hearing held on December 7, 2022. The Juvenile Court noted that prior to the hearing, Mother had filed a judicial complaint against Judge Kennedy. Judge Kennedy asked whether the parties wanted to proceed in spite of the pending judicial complaint. Mother declined to proceed. Judge Kennedy stated he could appoint a special judge for the day to address the visitation issue, but Mother refused this option as well. The Juvenile Court decided to await the results of the judicial complaint before hearing the pending motions. The Juvenile Court, however, modified its prior order regarding the exposure of the Child on social media, adding that neither party would refer to the Child by name in social media posts, any postings on the internet, or in emails to third parties.

In December 2022, the Kentucky Court of Appeals affirmed the Kentucky Court's order granting Father sole custody. Mother filed a motion to stay the proceedings in the Juvenile Court while she attempted to appeal the Kentucky Court of Appeals' decision to the Kentucky Supreme Court.

Father filed a motion to add Mother's mother, Judy L. ("Grandmother"), as a party given Mother's attempt to circumvent the Juvenile Court's prohibition on posting about the Child online by using Grandmother's Facebook account. Father then filed another motion for criminal contempt and supplement to his motion to change the Child's surname. Father alleged that Mother intentionally continued to violate the Juvenile Court's orders prohibiting her from posting the Child's name on social media and "false and defamatory allegations regarding Father" and the Child.

In April 2023, Mother filed a third motion for recusal, rehashing her previous grounds as well as the fact that the Juvenile Court had modified its order restricting Mother's social media use despite the pending judicial complaint filed against the judge. She also complained that the Juvenile Court added Wife to the order of protection. She also stated that she had filed a new judicial misconduct complaint against Judge Kennedy.

Mother filed a motion for injunctive relief, to set aside the Kentucky Court order granting Father sole custody, to grant Mother sole custody, and to hold Father in contempt. She claimed Father had violated her visitation rights in contravention of previous court orders.

In May 2023, the Kentucky Supreme Court denied all of Mother's motions for enlargement of time to file a motion for discretionary review, concluding litigation in Kentucky.

Trial began in June 2023, and the Juvenile Court heard testimony from Dr. Shannon Wilson, the clinical psychologist who conducted Mother's psychological evaluation. Dr. Wilson testified that Mother suffered from histrionic personality disorder. Dr. Wilson explained:

> So the general wisdom is that personality disorders are among the hardest to treat, primarily because one of the primary characteristics of all of the personality disorders is that the person with the disorder really doesn't feel like there's anything wrong with them. They tend to find explanations for all of their problems in people and events around them. So it's very hard for them to accept responsibility for the difficulties they're having in their lives and to recognize that there's a need for them to change. So there are some forms of therapy, like cognitive behavioral therapy and interpersonal therapy, that have shown some limited effectiveness in treating personality disorders. The tricky part with any therapy, though, is the patient has to sort of buy into the process and recognize that there's a need for the therapy.

With respect to how Mother's mental health may affect the Child, Dr. Wilson explained:

> So one of the difficult things for kiddos growing up with parents who have personality disorders is that those parents tend to be kind of unpredictable, and they struggle sometimes to put the needs of their children ahead of their own needs, and if there are problems in the parent/child relationship it's very difficult for personality disordered parents to look at what they may be contributing to the problem, and so the problem ends up being entirely the child's fault, which can be difficult. On top of that, I feel like, as Kendin gets older, you know, his parents are -- his friends are going to have parents who have access to social media, and they're going to see these things that are

being posted about him, and that's going to make his life significantly more complicated than it needs to be. And I've worked with kiddos caught in the middle of custody battles for 20 years, and there are few things in life harder than that for a child.

After Dr. Wilson's testimony, Mother requested a continuance, stating that she had to take Grandmother home due to her age and health. Mother had not contemplated the trial going much longer than a few hours, despite the numerous motions that had to be addressed.

In an interim order entered after the first day of trial, the Juvenile Court denied Mother's third motion for recusal, denied Mother's motion to remove the GAL, granted Father's motion to add Grandmother as a party, denied Mother's motion to add Wife as a party, and, again, prohibited Mother and Grandmother from using the Child's name or "detrimental language" in reference to the Child such as "kidnapped," "rescue," "free," and "stolen" in internet posts or emails. The Juvenile Court found that dissemination of the Child's name on social media and emails, in conjunction with accusations that he was stolen, had continued and that these posts were harmful to the Child and not in his best interest.

In July 2023, Mother filed a motion for sole custody based on a material change in circumstances, for enforcement of child support obligation, and enforcement of her proposed parenting plan. Mother alleged the following as material changes in circumstance: her relocation to Tennessee, the purportedly illegal order of protection, Father's alleged violation of court orders, Father's employment of two nannies, Father's separation from Wife, and the purported violation of her parental rights.

In September 2023, Mother filed a motion for a change of venue, alleging that she would not receive a fair and impartial trial due to the "personal differences that the Honorable Judge nurses against" Mother. She alleged that she had been under "constant duress" by the Juvenile Court judge, leading to deterioration of her mental and physical health. She rehashed the allegations made in her recusal motions. She asked that the venue be changed to Hamblen County. She also filed a motion to modify and set aside the order granting Father sole custody of the Child, claiming that Father was not taking proper care of the Child.

Father filed an emergency motion for injunctive relief to suspend Mother's parenting time pending psychological services and for criminal contempt. Father alleged that Mother's mental health had deteriorated and that she had contacted law enforcement, private citizens, and the Tennessee Department of Transportation about "sick, perverse and untrue claims of sexual abuse" against the Child. Mother apparently had accused Father's daughter of sexually abusing the Child and filmed the Child discussing these allegations. Father alleged that Mother had made similar allegations before and that the Tennessee

- 9 -

Department of Children's Services ("DCS") had investigated these allegations and determined them to be unfounded. Father alleged that Mother's allegations resulted in the Child being forensically interviewed for a second time. Mother also continued to post online allegations that the Child had been stolen from her.

After a hearing in September 2023, the Juvenile Court temporarily suspended Mother's parenting time with the Child, finding that the Child was in danger of irreparable harm. The Juvenile Court, again, restrained Mother from publishing any and all audio recording and/or videos she had made of the Child to the internet, to any email, or to any social media website, or providing such content to any non-law enforcement officials.

Father filed a motion for criminal contempt a month later, alleging that Mother had again violated the Juvenile Court's orders by sending an email to a member of the Bristol Chamber of Commerce, alleging that the Child had been a victim of sex crimes. In the email, Mother again alleged neglect by Father and sexual abuse of the Child by Father's daughter.

Mother filed a petition for a writ of mandamus in the Circuit Court for the City of Bristol ("the Circuit Court"). She alleged that Judge Kennedy was biased against her, violated her right to due process, and acted in bad faith and engaged in willful misconduct and retaliation against her. She asked that the writ direct Judge Kennedy to recuse himself, transfer venue, and vacate all orders entered after Judge Kennedy's disqualification.

Mother filed a motion to stay the proceedings until her petition for a writ of mandamus had been adjudicated. The Juvenile Court denied the motion, noting that trial had been set previously for June 15, 2023; trial proceeded on that date until noon when Mother requested a continuance; the remainder of trial was reset for September 14 and 15, 2023; Mother asked for a continuance the night before the first September trial date, claiming she had COVID; trial was reset for November 27 and 28, 2023; days before the first November trial date, Mother filed the petition for writ of mandamus; neither Father nor his counsel had been served with the petition as of the day of the trial; and the basis of Mother's petition was the issue of Judge Kennedy's recusal, which had already been raised multiple times and denied. Trial proceeded and concluded on November 27, 2023. Mother did not attend.

On January 31, 2024, the Juvenile Court entered its final judgment. The Juvenile Court fined and sentenced Mother to jail time for her spoliation of evidence. The Juvenile Court found that it was in the Child's best interest that his name be changed. The Juvenile Court dismissed Mother's pending motions due to her failure to prosecute. The Juvenile Court ordered that its September 2023 order suspending Mother's visitation would remain in effect until Mother engaged in "therapy with a provider experienced with legal issues and in the treatment of personality disorders." The Juvenile Court awarded Father his reasonable attorney's fees in the amount of $10,000.

- 10 -

Mother filed a motion to stay enforcement of the Juvenile Court's final judgment pending her appeal. The Juvenile Court granted the motion. After entry of the Juvenile Court's final judgment, Father filed multiple motions for criminal contempt due to Mother's continued violations of the Juvenile Court's orders. The Juvenile Court found six instances of criminal contempt based upon Mother's continued online posting about the Child. It fined Mother $300 and sentenced her to sixty days in jail. Forty-five days were to be suspended conditioned upon Mother removing the Child's image and name from publicly available locations. Mother appealed.

## Discussion

Although not stated exactly as such, Mother raises the following issues on appeal, which we have re-ordered: (1) whether the Juvenile Court judge should have recused himself and failed to provide Mother a fair trial, (2) whether the Juvenile Court violated her right to due process, (3) whether the Juvenile Court erred in suspending her parental time without clear and convincing evidence, and (4) whether the Juvenile Court erred in granting Father sole custody of the Child and failing to consider the Child's best interest.[2]

Mother argues that Judge Kennedy should have recused himself because Father and he live in the same neighborhood, their wives are friends, and they are "part of the same social circle of rich, high-society folk." She further argues that Judge Kennedy modified a previous court order from October 2020 to restrict her parental rights while her complaint of judicial misconduct against him was pending. Mother largely relies on Judge Kennedy's adverse rulings as evidence of his bias.

We review a trial court's recusal decision under the *de novo* standard of review. Tenn. Sup. Ct. R. 10B, § 2.01. With respect to our review of recusal decisions, our Supreme Court has explained:

> Rule of Judicial Conduct 2.11 "incorporates the objective standard Tennessee judges have long used to evaluate recusal motions." *Cook* [*v. State*], 606 S.W.3d [247] at 255 [(Tenn. 2020)]. "Under this objective test, recusal is required if 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis

---

[2] In her reply brief, Mother argues that the Juvenile Court erred in granting Father's petition to change the Child's name. She did not raise this in her statement of issues in her principal brief. We, accordingly, find Mother has waived this issue. *Hodge v. Craig*, 382 S.W.3d 325, 335 (Tenn. 2012) ("[A]n issue may be deemed waived when it is argued in the brief but is not designated as an issue in accordance with Tenn. R. App. P. 27(a)(4)."). Allowing an appellant to raise a new issue in her reply brief would prevent the appellee from having an opportunity to respond in his brief. The Rules of Appellate Procedure do not allow such a result.

for questioning the judge's impartiality.' " *Id.* (quoting *Davis*, 38 S.W.3d at 564-65).

The intermediate appellate courts have explained that the proponent of a recusal motion bears the burden of establishing that recusal is appropriate and that any alleged acts of bias or prejudice arise from extrajudicial sources rather than from events or observations during the litigation of the case. *Tarver v. Tarver*, No. W2022-00343-COA-T10B-CV, 2022 WL 1115016, at *2 (Tenn. Ct. App. Apr. 14, 2022). A trial judge has a duty to serve unless the proponent establishes a factual basis warranting recusal. *Raccoon Mtn. Caverns and Campground, LLC v. Nelson*, No. E2022-00989-COA-T10B-CV, 2022 WL 3100606, at *3 (Tenn. Ct. App. Aug. 4, 2022) (quoting *Rose v. Cookeville Reg'l Med. Ctr.*, No. M2007-02368-COA-R3-CV, 2008 WL 2078056, at *2 (Tenn. Ct. App. May 14, 2008)).

Furthermore, rulings adverse to the proponent of a recusal motion are not, standing alone, grounds for recusal. [*State v.*] *Cannon*, 254 S.W.3d [287] at 308 [(Tenn. 2008)]; *Davis* [*v. Liberty Mut. Ins. Co.*], 38 S.W.3d [560] at 564 [(Tenn. 2001)]; *Duke v. Duke*, 398 S.W.3d 665, 671 (Tenn. Ct. App. 2012). "Rulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). "[T]he mere fact that a judge has ruled adversely to a party or witness in a prior judicial proceeding is not grounds for recusal." *Davis*, 38 S.W.3d at 565 (citing *State v. Hines*, 919 S.W.2d 573, 578 (Tenn. 1995)). The "adversarial nature of litigation" makes it necessary for trial judges to "assess the credibility of those who testify before them, whether in person or by some other means," and "the mere fact that a witness takes offense at the court's assessment of the witness cannot serve as a valid basis for a motion to recuse." *Id.* "If the rule were otherwise, recusal would be required as a matter of course since trial courts necessarily rule against parties and witnesses in every case, and litigants could manipulate the impartial[it]y issue for strategic advantage, which the courts frown upon." *Id.*

*Adams v. Dunavant*, 674 S.W.3d 871, 878-79 (Tenn. 2023).

At a hearing in June 2021, Judge Kennedy disclosed that Father lived in his subdivision, but that he did not know Father and had not seen him. He further disclosed that his wife had run into Wife while walking in the neighborhood. Judge Kennedy explained that Father and Wife had recently moved and that Wife had contacted Judge Kennedy's wife, who does, "for lack of a better term, organizing, helping people move in."

- 12 -

Judge Kennedy informed his wife that she must decline to assist Wife. At the time, Mother's counsel had no objection.

Several months later, Mother filed a motion for recusal based upon the fact that Wife and Judge Kennedy's wife were friends on Instagram. Judge Kennedy denied the motion finding: "It appears the allegations are made based upon certain 'thumbs up' 'Likes' or 'smiley face emoji' (3-4 total) of certain products my wife sells (i.e. wine sales)[.] There has been no communication and there is no friendship."

Mother filed a second motion to recuse Judge Kennedy, noting that Judge Kennedy's wife had liked four of Wife's Instagram posts in September and October 2021. Judge Kennedy denied her motion, finding "'Posts' are not conversations and do not create a friendship or relationship of any kind between the Judge's wife, and the Petitioner's wife, as alleged by Petitioner's counsel. . . . This Judge is not prejudiced or biased because his wife 'Likes' a 'Post.'"

In April 2023, Mother filed her third motion for recusal, largely presenting the same arguments she made in her previous motions. She also added complaints about two of the Juvenile Court's orders. Judge Kennedy denied the motion on the first day of trial.

Mother has not carried her burden of proof to establish that recusal of Judge Kennedy is appropriate. *Id.* ("the proponent of a recusal motion bears the burden of establishing that recusal is appropriate"). The fact that Judge Kennedy lived in the same neighborhood as Father, that his wife had previously interacted with Wife, and his wife liked a few of Wife's Instagram posts does not create an appearance of impartiality or bias. *See Allen v. Allen*, No. E2023-01660-COA-T10B-CV, 2023 WL 8598662, at *5-6 (Tenn. Ct. App. Dec. 12, 2023) (finding that the father had failed to demonstrate that the judge had a close relationship with the mother such that it would create an appearance of bias when the judge and the mother had participated in a theatrical play together seven years prior, the mother had previously spoken to the judge "informally" about representing her in her divorce, and the judge had declined to represent her). Despite Mother's allegation that Judge Kennedy allowed an "external social relationship" with Father to affect his judicial conduct, there is no evidence that Judge Kennedy knew or had even met Father or Wife outside of the legal proceedings. There was no "external social relationship." We, accordingly, affirm Judge Kennedy's decision to deny Mother's recusal motions.

Mother also argues that Judge Kennedy failed to perform his duties in an impartial manner and acted with bias and prejudice against her. Her argument consists of unsupported assertions and complaints about Judge Kennedy's rulings. As evidence of Judge Kennedy's bias against her, Mother points to the Juvenile Court's dismissal of all of her pending motions after she failed to show up for the second day of trial, the Juvenile Court's denial of her motion for contempt, the Juvenile Court's failure to consider a report from a batterer's intervention program provider Mother had seen in Kentucky, and the

Juvenile Court's failure to rule on her motion to request transcripts of the proceedings. However, "[a]dverse rulings by a trial court are not usually sufficient grounds to establish bias." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994). Without more, Judge Kennedy's adverse rulings do not demonstrate that he adjudicated this case unfairly or failed to judge the case impartially. We discern no bias or prejudice against Mother in Judge Kennedy's adjudication of this case.

Relatedly, Mother argues that the Juvenile Court violated her right to due process. The crux of Mother's argument is that the Juvenile Court supposedly did not give her a chance to present her case. Mother fails to adequately cite to the record to demonstrate evidence that she was deprived of her right to due process.[3] She only cites to the Juvenile Court's emergency order granting Father injunctive relief. Based upon our review of the evidence, Mother knew that the second day of trial was scheduled for November 27, 2023, and yet, she did not attend. We discern no violation of Mother's right to due process based on the Juvenile Court's rulings.

Mother refers to the GAL's failure to visit her house and alleged attempt to "influence the proceedings and suggest mental health evaluators" for Mother as evidence of a violation of her right to due process. However, Mother provides no explanation or argument for how the GAL's actions violated her right to due process. She cites to the GAL's testimony that she did not visit Mother's home because Mother's former counsel and she "scheduled a day and [Mother's former counsel's] assistant was going to try to get with her and I never heard back from your office." Mother also cites to the GAL's testimony that Mother did not want her to come to her home unless someone was with Mother, and when the GAL attempted to schedule that, she was unable to do so. Mother does not explain how this was a violation of her right to due process and cites only to Tenn. Code Ann. § 34-1-107, which deals with guardian *ad litems* in guardianship and conservatorship cases, which are irrelevant to the present case. We, accordingly, discern no violation of Mother's right to due process based on the GAL's actions.

Mother further contends that the Juvenile Court erred by suspending her parenting time without "clear and convincing" evidence. In reviewing the Juvenile Court's order suspending Mother's parenting time, we note that this Court has previously explained:

> "[T]he details of custody and visitation with children are peculiarly within the broad discretion of the trial judge." *Suttles v. Suttles*, 748 S.W.2d 427 at 429 (Tenn. 1988). *See also Edwards v. Edwards*, 501 S.W.2d 283 (Tenn. App. 1973). We have no problem with the trial judge terminating visitation

---

[3] In her appellate briefs, Mother complains that the appellate record was incomplete at the time she filed her principal brief. However, we note that the record was supplemented prior to Mother filing her reply brief. In her reply brief, Mother does not address the issue of how the Juvenile Court violated her right to due process and does not include citations to the record to lead this Court to make such a finding.

- 14 -

privileges altogether on a finding that such visits would result in harm to the child "in either a physical or moral sense." *See Suttles* at 429. We are also told that visitation can be denied to a non-custodial parent when it would result in severe emotional harm. *See* Tenn. Code Ann. § 36-6-301 (Acts 1995, ch. 428, § 3). But absent such findings, the public policy of this state is that the court *shall* "grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship." *Id. See Pizzillo v. Pizzillo,* 884 S.W.2d 749 (Tenn. App. 1994).

*Helson v. Cyrus,* 989 S.W.2d 704, 707 (Tenn. Ct. App. 1998). This Court has further concluded that "courts may restrict, suspend, or terminate visitation rights upon the presentation of clear and definite evidence that permitting continued visitation will jeopardize the child physically, emotionally, or morally." *Bueno v. Todd,* No. W2005-02164-COA-R3-CV, 2006 WL 2106006, at *5 (Tenn. Ct. App. July 31, 2006).

In temporarily suspending Mother's parenting time, the Juvenile Court made extensive findings of fact, citing Mother's admissions of her deteriorating health, her persistent emails violating the Juvenile Court's previous orders, her unproven allegations that the Child's half-sister was sexually abusing him, her continued public allegations that the Child was stolen from her, her posting of confidential court records to emails, and her inability to regulate her mental processes and resulting behavior. The Juvenile Court also found, just as had the Kentucky Court, that Mother had been dishonest; continued her obsession with and harassment of Father and his family; displayed contempt for the Juvenile Court, parties, and attorneys; refused to accept and comply with court orders; and exhibited poor judgment, mainly by using the Child as a pawn in litigation.

The Juvenile Court also made findings based upon the report and testimony of Dr. Wilson, stating:

> The report of Dr. K. Shannon Wilson, Ph.D., Licensed Clinical Psychologist/HSP (the psychologist chosen by [Mother]) was filed with this Court on June 23, 2022, and her testimony was presented June 15, 2023. Her testimony and findings as to the [Mother] are as follows:
>
> a) She is likely to become irritable quickly when faced with demands and expectations. Her facade of sociability appears to serve as cover for a deep contempt for conventional morals and social norms. While she makes a good first impression, those in longer-term relationships with her will experience her characteristic impulsiveness, unreliability and moodiness. She is likely to be untrustworthy, and to consistently seek excitement and attention by exhibiting self-dramatizing behavior and hostile outbursts. She is unlikely to admit responsibility for her current difficulties,

despite the fact that she often fails to meet basic responsibilities and is prone to self-indulgent behaviors. She may insist on being the center of attention and has minimal regard for the consequences of her actions. The profile states "stimulus-seeking, she may restlessly chase one capricious whim after another, and she may have traveled an erratic course of irresponsibility, perhaps even delighting in defying social conventions. She appears to have a poor prognosis for staying out of trouble."

b) Her responses to the test items resulted in a profile of questionable validity, due to her attempt to place herself in an unrealistically positive light by minimizing her faults and psychological problems. She does not appear to have good insight into her behavior and may be unaware of her difficulties. The profile states that she "is unlikely to seek psychological treatment or to cooperate fully with treatment if it is suggested to her". Her profile is consistent with those of people who are chronically maladjusted; specifically, she is likely to be narcissistic and self-indulgent. While she is dependent on others and demands a great deal of attention from others, she is also hostile toward others and frequently resentful of them. She has difficulty managing her anger appropriately and may have a history of acting out and inappropriate sexual behavior. She is unlikely to take responsibility for her problems and seems to have a negative attitude toward rules and norms of society. Individuals with this profile are unlikely to be good candidates for psychotherapy, due to the fact that they tend to blame others for their problems and resist accepting the need to change.

c) She currently meets criteria for the following diagnoses: Histrionic Personality Disorder, with antisocial and paranoid features[,] Adjustment Disorder with Mixed Disturbance of Emotions and Conduct[,] Unspecified Anxiety Disorder, by history[,] Major Depressive Disorder, by history.

d) It seems, from review of the vast amount of information provided related to this case, that this situation has been something of a perfect storm. She has clearly held a general disregard for the typical expectations and norms of society since long before she met [Father]. It is also likely that her histrionic characteristics have been present since her adolescence. It also seems clear based on the evidence that I reviewed that she truly believed that [Father] loved her and intended to create a life with her. When that

- 16 -

relationship ended, and the dream she had for her future fell apart, her functioning quickly deteriorated as well. It is not uncommon for particularly stressful events to magnify unhealthy personality characteristics, and it seems that that is what has happened in this case and has unfortunately turned [Mother] into her own worst enemy. Once she felt that she had been wronged, she has struggled mightily to control her behavior. Her social media posts and other activities show poor impulse control and poor situational judgement. The fact that they continued up until the writing of this evaluation, in spite of the court order directing her to cease, shows that she still struggles to use good judgment even when doing so is in her own best interest and that of her child. *While it does not seem that she presents a direct threat of physical harm to her child, the risk of emotional harm is present if she is not able to manage her behavior more appropriately. This emotional harm could come as the result of her continuing to place him at the center of a very ugly and public custody battle, or through the relating of inappropriate or false information to him as he gets older.* I would like to make it clear, however, that based on the evidence reviewed during this evaluation, she has valid reasons to feel that she was tricked and has been treated unfairly. It is also evident that she feels that she has been backed into a corner and left with no other option than to fight. However, the way that she has responded to the situation has been obviously inappropriate and counterproductive.

e) Recommendations at this time are that she engage in individual therapy with a provider experienced with legal issues and in the treatment of personality disorders. The goal of that therapy should be to help her find more effective and productive ways to cope with the enormous amount of stress that she is experiencing, and to improve her ability to evaluate her own contributions to her current difficulties. It is possible that medication will also be helpful in improving her impulse control in stressful situations, and therefore a medication consult is also recommended. It is unlikely that she will be willing to fully and honestly participate in these appointments, and therefore it is recommended that her providers have access to this evaluation.

\* \* \*

Based upon Dr. Wilson's testimony and findings, and considering the best interests of the child, the Court finds that the Ex Parte Order, entered

September 27, 2023, is to remain in full force and effect and that [Mother's] parenting time is suspended until such time as [Mother] engages in individual therapy with a provider experienced with legal issues and in the treatment of personality disorders as described above.

Based upon our review, the evidence supports the Juvenile Court's findings, and the Juvenile Court's decision to temporarily suspend Mother's visitation pending psychological treatment is supported by clear and definite evidence.

Mother mainly argues that the Juvenile Court erred by relying on the "uncredible" testimonies of Father and Dr. Wilson. However, we note the longstanding principle that "appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999). By relying on Father's and Dr. Wilson's testimonies, the Juvenile Court clearly found them credible witnesses. Mother does not cite to clear and convincing evidence to compel us to re-evaluate the Juvenile Court's reliance on these witnesses. Based upon our review of the evidence, Father presented more than sufficient evidence that continued visitation with Mother would jeopardize the Child emotionally.

Mother also argues that the Juvenile Court erred by failing to consider the Child's best interest. We first note that to the extent Mother argues that the Juvenile Court erred by awarding Father sole custody, this is an inaccurate assessment of the proceedings. The Kentucky Court granted Father sole custody of the Child. Although the Juvenile Court dismissed Mother's petition to modify the Kentucky Court's custody order due to her failure to prosecute her petition, it did not initially award Father custody. We affirm the Juvenile Court's dismissal of her petition to modify custody, given that she failed to attend the second day of trial or otherwise prove her case, and she did not raise the Juvenile Court's dismissal of her petition as a designated issue on appeal.

Mother argues that the Juvenile Court should have considered the best interest factors outlined in Tenn. Code Ann. § 36-6-106 before temporarily suspending her parenting time. However, the Juvenile Court did consider the Child's best interest, specifically crediting Dr. Wilson's testimony and report that the Child was at risk of emotional harm by Mother's inappropriate behavior and placement of the Child at the center of a "very ugly and public custody battle." The Juvenile Court stated that it made its decision based upon Dr. Wilson's testimony and after "considering the best interests of the child."

We note that although Mother essentially characterizes the Juvenile Court's action as an initial custody determination and Father characterizes it as modification of the Kentucky Order, the Juvenile Court's action was merely a temporary suspension pending Mother's engagement in therapy to correct her negative and erratic behaviors. The Juvenile

Court's temporary suspension of Mother's parenting time was not a permanent modification; rather, it was just that, temporary.

Furthermore, Mother held the keys to unlocking this suspension by engaging in psychological treatment, for which the record clearly demonstrates a need. In addition, it is clear from the Juvenile Court's order that it found the risk of emotional harm to the Child resulting from Mother's negative and erratic behaviors to be decisive as to the Child's best interest. By consistently violating court orders and making her custody dispute and unproven allegations public, Mother placed the Child at great risk of emotional harm, and she has no one to blame for this outcome but herself. We, accordingly, discern no error in the Juvenile Court's decision to suspend Mother's parenting time without specific reference to the best interest factors outlined in Tenn. Code Ann. § 36-6-106. The Juvenile Court's action was not a modification but rather a temporary suspension of Mother's parenting time in response to a motion for injunctive relief. We, accordingly, affirm the Juvenile Court's temporary suspension of Mother's parenting time pending her engagement in psychological treatment.

Father seeks an award of attorney's fees on appeal, given that Mother's appeal is purportedly frivolous under Tenn. Code Ann. § 27-1-122, which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include, but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

A frivolous appeal is one that is "utterly devoid of merit." *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978). Although Mother's appeal is unsuccessful, it is not so devoid of merit as to be considered frivolous. We deny Father's request for attorney's fees on appeal.

### Conclusion

For the foregoing reasons, we affirm the Juvenile Court's judgment. We deny Mark K.'s request for attorney's fees on appeal. We remand to the Juvenile Court for collection of the costs below. Costs of the appeal are assessed against the appellant, Rhonda L., and her surety, if any.

D. MICHAEL SWINEY, CHIEF JUDGE